Ballard & Ballard Co. v. Lee's Admr.

CASE 45.—ACTION BY HENRY LEE'S ADMINISTRATOR AGAINST THE BALLARD & BALLARD COMPANY FOR NEGLIGENTLY CAUSING THE DEATH OF PLAINTIFF'S INTESTATE.—January 19.

## Ballard & Ballard Co. v. Lee's Admr.

Appeal from Jefferson Circuit Court; Common Pleas Branch (Third Division).

MATT O'DOHERTY, Judge.

Judgment for plaintiff, defendant appeals—Reversed.

1. Master and Servant—Injuries to Third Person—Independent Contractor—Existence of Relation—Control of Work.—If the owner had no control or direction over the work of tearing down a building, except to see that it was done according to the contract, and the contractor exercised his own judgment as to the details of the work, and the manner of doing it, he was an independent contractor, and not a servant, and whether he was paid by the day, or week, or in a lump sum, was immaterial in determining the relation.

2. Master and Servant—Actions—Jury Question—Independent Contractor.—In an action for decedent's death while engaged in tearing down a building, whether the person who employed decedent, and under whose direction he was working, was defendant's servant, or an independent contractor, held for the jury.

3. Employer's Liability.—If the person for whom, and under whose direction, decedent was working when injured was an

Ballard & Ballard Co. v. Lee's Admr.

independent contractor, and not a servant of defendant, defendant would. not be liable for his death from injuries resulting from the contractor's negligence.

4. Risks Assumed—Dangers Incident to Nature of Employment. —An experienced employe, who undertakes the work of wrecking a building, which is necessarily dangerous, assumes the ordinary risks incident to the employment.

5. Injuries—Place of Work—Building Contracts.—The master's . duty to furnish a safe place to work does not apply to the wrecking of a building, which is necessarily hazardous.

6. Injury to Servant—Place of Work—Master's Knowledge of Danger.—If the master knows that the place of work is dangerous, whether it is inherently hazardous or not, and the servant by exercising ordinary care could not discover that fact, the master, if he does not inform the servant of the danger, will be liable.

7. Assumption of Risk—Compliance with Commands.—Where the master expressly directs his servant to work in a place known to the servant to be dangerous, the master is liable for an injury caused to the servant thereby, unless the work was so dangerous that no one of ordinary prudence would have undertaken it.

8. Place of Work—Master's Duty—Necessity of Exercising Care —Hazardous Work.—Where the work is necessarily dangerous, as the wrecking of a building, the master is not bound to exercise ordinary care to discover the danger, so that he would not be liable for injuries resulting from unknown defects, even though they were discoverable by exercising ordinary care.

9. Fellow Servant—Vice Principals—Persons Engaged in Superintendence.—A contractor, employed by defendant's architect to tear down a building, who employed and paid the laborers and directed their work, if he was a servant, and not an independent contractor, as well as the architect himself, who had general charge and superintendence of the work, and another employe of defendant who sometimes directed the performance of the work in the contractor's absence were all superior servants to a workman employed on the building, for whose acts in the course of the work defendant would be liable as if it had personally directed the work.

FAIRLEIGH, STRAUS & FAIRLEIGH for appellant.

The roof of the boiler-shed was of the ordinary construction. The method of its construction was known to Leatherman and

his employes. They were professional wreckers. The work was in itself hazardous. If the workmen were the servants of the Ballard & Ballard Company, they assumed the ordinary risks of the employment. It would be tedious to review the evidence, but we submit that if by any possibility Lee can be held to have been the servant of the Ballard & Ballard Company, yet there is absolutely nothing in the evidence upon which to predicate negligence upon the part of that company. Upon this ground the motion for a peremptory instruction should have been granted, or at all events a new trial should have been granted.

## AUTHORITIES CITED.

Morgan v. Smith, 159 Mass. 574; Hexamer v. Webb, 101 N. Y. 377; Geer v. Darrow, 6. Conn. 224.

CARUTH, CHATTERSON & BLITZ for appellee.

## POINTS AND AUTHORITY.

The evidence in this case shows that the decedent went upon the roof of the building with the consent, and in the presence of an officer of the defendant for the purpose of working upon the roof; that there was a defect in the roof, which was known to defendant, or could have been known by the exercise of ordinary care. That the decedent did not know, or have any opportunity of knowing. That by reason of said defect, he lost his life. If the defect had not been there, there could have been no danger or injury to the decedent, and he was using these premises, as it was reasonably necessary that he should use them, under the assurance of law that such parts were reasonably safe for the purpose of such use. This being the case, the defendant is liable. (Smith v. Trimble, 23 Ky. Law Rep. 1206.)

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

Ballard & Ballard Company owned and operated a flouring mill in the city of Louisville. The company wished to enlarge one of its buildings, and to do this it became necessary to remove the roof, and do other work about the building. They employed Henry Wolters, an architect, to make the plans and speci-

fications for the improvement, and also authorized him to employ a contractor to do the required work. Wolters engaged a contractor named Leatherman, who was largely engaged in the business of wrecking buildings and excavating foundations. Under the arrangement with Wolters Leatherman was to be paid for his services, while engaged in the work, $3 per day, and the men that he employed were to receive $1.50 per day. The selection and number of laborers to be engaged was left to Leatherman. At the end of each week, or when pay day came, Leatherman presented to Ballard & Ballard Company a statement showing the number of hands he employed and the days they worked, anl received from the company a check for the amount due the laborers, as well as the sum due himself, and Leatherman then paid his employes the wages coming to each of them. Work was commenced in removing the roof from one of the high buildings, and, after it had progressed for some days, the decedent, Henry Lee, who had worked for several years as a laborer for Leatherman in tearing down buildings and excavating, took his place with the hands on the roof of the building to assist in removing it. The roof was covered with tar paper, laid on board sheeting, which was placed on a foundation of cinder concrete, the concrete resting upon sheet iron that was fastened to the bottom of the girders or rafters that supported the roof. The cinder concrete was not strong enough to support the weight of a person standing on it, although there is some evidence that it presented the appearance of being regular concrete and of sufficient strength to support a person. The laborers who had been employed before the arrival of Lee had placed some planks on the top of the girders, and on these planks they gen-

erally stood while taking off the paper roofing and sheeting, but sometimes they secured themselves by placing their feet upon the girders, and it is generally agreed that the work was dangerous. On the day of the accident the employes who had been engaged on the roof were ordered to another part of the building, and they removed from the roof the planks they had been using. After they left the roof Lee and a co-laborer named Norris were directed to remove the roofing, and while engaged in this work Lee stepped or stood on the concrete and fell through the roof to the ground, a distance of some 35 feet, receiving injuries from which he soon afterwards died. At the place through which he fell the iron that supported the concrete had decayed, and this was discovered by some of the other laborers a few days before, while they were on the ground floor looking up at the roof. On the top of the roof the sheeting in some places was rotten and the roof defective and unsafe, and this fact was discovered by the laborers engaged in taking off the roof before Lee went on the roof. The theory of appellant is, first, that Leatherman was an independent contractor, and the laborers he employed, including Lee, were his employes; second, assuming that Leatherman was not an independent contractor, and that they were employes of Ballard & Ballard Company, yet Lee, as well as the other laborers, had had long experience in the work of wrecking buildings, and that the work was in itself hazardous, and the person who engaged in it assumed the risk incident to this perilous employment; third, that there was no evidence bringing home to Ballard & Ballard Company knowledge of the defective condition of the roof, nor was it in such condition as to put them upon notice. The theory of appellee is that, aside from

the question whether Leatherman was or not an independent contractor, Lee was upon the roof with the knowledge and consent of Ballard & Ballard Company, engaged in a service for them, and hence it was their duty to notify him of any defect in the roof known to them, or which could have been known to them by the exercise of ordinary care on their part, and which was not known to Lee, and could not have been discovered by him in the exercise of ordinary care. The trial court took appellee's view of the case, and instructed the jury, in substance, that if they believed from the evidence that the portion of the roof through which the deceased fell was decayed to a degree that made it dangerous to the decedent while performing the work required of him, and that such decayed condition was known to Ballard & Ballard Company, or could have been known to them by the exercise of ordinary care, and its condition was not known by the deceased, and could not have been known by him in the exercise of ordinary care, they should find for the plaintiff. Under the evidence and the instructions the jury returned a verdict in favor of appellee for $2,500.

One of the principal questions to be determined is whether or not Leatherman was an independent contractor. If it should be ruled from the evidence as a matter of law that he was an independent contractor, Ballard & Ballard Company are not liable in damages for the death of his employe Lee; or, if this question under the facts is in dispute, then it should have been submitted to the jury. Looking a little more carefully into the evidence for the appellee upon this point, we find that an employe of Ballard & Ballard Company named Playford was their superintendent of the work, and was frequently about

where it was going on, and at times, in the absence of Leatherman, would not only tell the laborers what to do, but how to do it, directing them as to the manner of doing the work right, and correcting them when wrong. In short, that he exercised all the functions of an employer in controlling and directing the details of the work, keeping an account of the wages due Leatherman as well as the laborers, and looking after its payment, and also exercised a general superintendency over Leatherman. On the other hand, the evidence for Ballard & Ballard Company was to the effect that the architect, Wolters, had general charge and superintendency of the work, and employed Leatherman as a contractor to do it. That neither they, nor Playford, had anything to do with the employment or discharge of the men, nor did they give any directions how to do the work, or exercise any control over, or have anything to do with the laborers, except to see that the work was done right; but, in the absence of the architect, Playford would tell Leatherman what work was to be done. If Leatherman and the laborers were mere employes of Ballard & Ballard Company, then the relation of master and servant existed, with its reciprocal obligations and duties. On the other hand, if Leatherman was employed as a contractor to do the work, and Ballard & Ballard Company had no control or direction over him or the employes, except to give directions as to what work should be done, and to see that it was done in the proper manner, Leatherman should be treated as an independent contractor, and the relation of master and servant would not exist between Leatherman and his employes upon the one side, and Ballard & Ballard Company upon the other.

The fact that the person for whom work is being

done, or the owner of the property, directs what shall be done, and the kind or quality of material to be used, and exercises a general superintendency over the work to see that it is done properly and according to contract, will not create the relation of master and servant between him and the contractor engaged to do the work or the laborers under the contractor. Or, as said by some of the authorities, if the owner or person having the work done engages a contractor, "who represents the will of his employer or owner only as to the result of his work, and not as to the means by which it is accomplished," or if the contractor "furnishes his own assistants, and executes the work, either entirely according to his own ideas, or in accordance with the plans previously given to him by the person for whom the work is being done, without being subject to the orders of the latter in respect to the details of the work," the person engaged to do the work will be regarded as an independent contractor, and the laborers he employs will be his servants, and not the servants of the owner of the property. Nor is the manner of payment of the contractor, whether it be by the day or week or in a lump sum, a material factor in determining the relation between the parties. But if the owner or person having the work done not only directs what shall be done, but how it shall be done, and controls the laborers employed upon it, or if the person engaged to do the work "is at all times subject to the will of his employer, or cannot properly refuse to obey his directions as to the mode in which the work shall be done and the persons to be employed," the relation of master and servant, and not that of independent contractor, exists, although the employer should never exercise such control, and the employe should be paid

by the job instead of by the day or week. To put it in a simpler form, and with especial reference to the case before us, if under the contract with Leatherman, Ballard & Ballard Company had no control or direction over the work, except to see that it was done properly and according to contract, and Leatherman used his own judgment and methods in the execution of it, then Leatherman was an independent contractor; but if under the contract Ballard & Ballard Company had the right to control and direct the details of the work and the mode or manner in which it should be done, and Leatherman in its execution was at all times subject to their orders, he was not an independent contractor. Shearman & Redfield on Negligence, sections 164, 165; 26 Cyc. 970; 16 Am. & Eng. Ency. of Law, 187; Thompson on Negligence, sections 621-629; Morgan v. Smith, 159 Mass. 574, 35 N. E. 101; Hexamer v. Webb, 101 N. Y. 377, 4 N. E. 755, 54 Am. Rep. 703; Geer v. Darrow, 61 Conn. 224, 23 Atl. 1087; Robinson v. Webb, 11 Bush, 464; Jann v. Wm. McKnight Co., 117 Ky. 655, 78 S. W. 862.

As under the facts of this case it cannot be determined as a matter of law whether Leatherman was or not an independent contractor, we conclude that the question should have been submitted to the jury under appropriate instructions, and the jury should be told that if Leatherman was an independent contractor, Ballard & Ballard Company were not liable in damages for the death of Lee. If the jury should find from the evidence under appropriate instructions that Leatherman was not an independent contractor, but that the relation of master and servant existed between Ballard & Ballard Company and Leatherman and the other laborers, then the question arises, What was the duty of Ballard & Ballard Company under

the facts of this case? The work being done by Bal-
lard & Ballard Company was in itself hazardous. The
tearing down or wrecking a building is accompanied
by risks and dangers that cannot well be foreseen or
guarded against. Generally work of this kind is done
because the property is out of repair, or parts of it
in a defective or decayed condition, or it is desired to
add to or improve it. And the employe who under-
takes work of this nature, if he be experienced, must
be held to assume the ordinary risks incident to the
employment. The duty of the master in reference to
safe places and premises can not, in the very nature
of things, have any application to employment like
this, and hence the rules regulating and controlling
the liability of the master in this particular have no
place. Although, if the master knows that a place in
which he directs his servant to work, whatever the
employment may be, is dangerous or unsafe, and the
servant does not know these conditions, and by the
exercise of ordinary care upon his part could not
discover them, or if the master, being present, gives
directions to the servant to go on with work that the
master knows is dangerous, he will be liable although
the servant is also aware of the peril, unless the work
is so obviously dangerous that no man of ordinary
prudence would have undertaken it.

But the master is not, in cases like this, charged
with the duty of exercising ordinary care to discover
the dangerous or unsafe place, and is not liable to
respond in damages for an injury to the servant
because of the defective or dangerous condition that
he did not know of, but which might have been dis-
covered by the exercise of ordinary care. In Thomp-
son on Negligence, section 3979, we find the follow-
ing: "The work of tearing down an old building is

necessarily attended with dangers, which arise in the progress of the work, and which the master can not always anticipate and provide against. Therefore it has been held that the rule which makes it incumbent upon the master to provide his servant with a safe place within which to work does not. apply in such situation, though it is conceded to be the duty of the master not to send his servants into a place which he knows to be dangerous without apprising them of the danger. * * * In the destruction of a building there is no attempt or obligation on the part of. the master to make it secure; but, on the contrary, the work of removal is one in which in turn each part of the structure becomes insecure. This every workman understands, and he must be governed accordingly. But, while a person engaged in the demolition of a building is not bound to furnish a workman engaged therein with a safe place to work, he is under an obligation not to send him into a place known to the master to be dangerous, and which the workman can not perceive to be so by the use of ordinary care." And the principle here announced has been fully applied by this court in Wilson v. Chess & Wymond Co., 117 Ky. 567, 78 S. W. 453, 25 Ky. Law Rep. 1655; Shemwell v. Owensboro, etc., R. Co., 117 Ky. 556, 78 S. W. 448, 25 Ky. Law Rep. 1671.

It is not possible to lay down any general principle that may be strictly applied in defining the duty of the master to his servant in the performance of the duties for which he has been employed. Nor is it possible to define with precision the line. that separates the obligation to furnish reasonably safe places and instrumentalities from conditions that absolve the master from the full performance of this duty. Nearly every case presents different facts, and

to these ever varying facts must be applied the law as the court understands it. This court has taken a strong and well-defined position upon the subject of holding the master to a strict accountability in furnishing safe places, as well as appliances, and we do not intend or desire to get away from the long line of decisions declaring and enforcing this rule. But manifestly there are some cases in which it should not be applied, and we think this is one of them. Labatt on Master and Servant, section 29. It seems to us that if the owner of a house employs a competent and experienced laborer to take off an old roof and put on a new one, or to repair the roof, or to tear down a building, it is fair to assume that the employe will take the necessary precautions to protect himself from injury on account of the dangerous or defective condition of the premises about which he is engaged to work, and that it would be imposing upon the employer an unreasonable duty to require him to have a careful examination of the premises made for the purpose of discovering defects or dangers in order that he might inform the employe concerning them. But if he knows of them, he should be required to impart the information to the employe, unless they are of such a character that the employe by the exercise of ordinary care could discover them. Usually the rule in reference to safe places is violated by the negligence of the master in failing to keep a place reasonably safe that, in the proper conduct of the business, should be in a reasonably safe condition and in suitable repair, or in negligently failing, in the first place, to furnish a reasonably safe place when such a place, except for the negligence, might have been provided. But clearly the master can not be held liable for failing to furnish safe places when

he is having the place repaired, or torn down because it has become unsafe and defective, or needs improvement, and he is employing laborers to put it in a sound condition. To impose upon the master, under conditions like these, the necessity of furnishing a safe place would amount to an absurdity, and be a contradiction of terms. In Shearman & Redfield on Negligence, section 185, the rule in relation to the question we are considering is thus stated: ''Notwithstanding the general rule that the master is bound to use due care to furnish safe and sound materials, machinery, etc., yet the servant assumes the risk of obvious defects in the thing which he voluntarily uses. If his work consists, in whole or in part, in dealing with dangerous, unsafe, or unsound things, known to him to be so, or obviously so, and which by the very nature of the business must be used while in that condition, he assumes the risk of doing so. Thus a railway servant, employed to remove damaged cars to a repair shop, has no right to complain of injuries suffered from the known defects of such car. The ordinary risks of a particular business are those which are part of the natural and ordinary method of conducting that business, even although they might fairly be called extraordinary with reference to a different business, or a different department of the same business.''

Applying these principles to the facts of this case, our conclusion is that Lee assumed the ordinary risks incident to the employment, and that Ballard & Ballard Company were not liable unless they failed to warn him of defects or dangers known to them, and which he could not, by the exercise of ordinary care, have discovered. If there was any evidence that Lee knew, or by the exercise of ordinary care could have

discovered, that the place was unsafe, Ballard & Ballard Company would not be liable, unless, with knowledge of its dangerous and defective condition, they directed him to do the work, and, depending on their assurance, he engaged in it, and, even under circumstances like these, they would not be liable if the danger was so obvious that a person in Lee's situation, with his intelligence and understanding, ought not to have undertaken it. But there is no evidence in the record presenting this view, and it is not necessary to further elaborate it.

We are also of the opinion that if the relation of master and servant existed between Ballard & Ballard Company and Leatherman, then Leatherman, as well as Playford and Wolters, were the agents of Ballard & Ballard Company, superior in authority to Lee, and Ballard & Ballard Company are bound by their acts and conduct in the course of the employment, and their knowledge of existing conditions, to the same extent as they would be if they in person had superintended the work or directed or controlled the laborers.

On another trial the court, in addition to the usual instructions defining the measure of damages and ordinary care, should instruct the jury as herein indicated; and the judgment is reversed, with directions to grant a new trial.