CASE 38.—ACTION BY JOHN Y. WIGHT AGAINST THE CUMBERLAND TELEPHONE & TELEGRAPH COMPANY.—March 3, 1910.

## Wight v: Cumb. Telph. & Telg. Co:

Appeal from Jefferson Circuit Court (Common Pleas Branch, First Division).

EMMET FIELD, Judge.

From a judgment dismissing his petition, plaintiff appeals.—Affirmed.

1. Master and Servant—Negligence of Fellow Servant.—The master is not liable for injuries to a servant caused by the negligence of a fellow servant.

2. Master and Servant—Injuries to Servant—Contributory Negligence—Proximate Cause.—Plaintiff and another were experienced employes of a telephone company employed to take out telepnones from residences and remove the wires, and, when plaintiff was injured, they were engaged in taking down a wire which ran from a pole over a trolley wire to the house, the end of the wire attached to the telephone having been removed, leaving the wire attached to the house and to the pole, and when the other workman detached the wire from the pole, it fell on the trolley wire, shocking plaintiff, who at the time was holding the end of the wire detached from the telephone. The telephone wire was not insulated as was usual where it went over a trolley wire, and plaintiff and the other could see that it was not insulated at the ends which they handled, but plaintiff did not know whether it was insulated over the trolley wire. A rope was furnished for taking down wires in such cases so as to avoid danger, but plaintiff did not use it. Held, that the proximate cause of plaintiff's injuries was the failure to use the rope in taking down the telephone wire, and not the lack of insulation.

3. Master and Servant—Assumption of Risk—Safe Place of Work—Changing Conditions.—The rule requiring the master to use ordinary care to furnish a reasonably safe place of

work is subject to the exception that the servant assumes risks resulting from changes made in the place of work by him in the ordinary progress of the work.

DODD & DODD and W. H. FIELD for appellant.

FAIRLEIGH, STRAUS & FAIRLEIGH and NICHOLAS H. DOSKER for appellee.

OPINION OF THE COURT BY JUDGE HOBSON—Affirming.

John Wight was in the service of the Cumberland Telephone & Telegraph Company as a member of a take-out crew; that is, a crew whose duty it was to remove telephones from houses when the service was discontinued. Wight and a man by the name of Goldstein constituted the crew; neither being the superior of the other. They went to take out the telephone from the house of a Mrs. Wolf on East Burnett street in Louisville. The telephone wires ran along East Burnett street on the opposite side of the street from the house, and a wire was stretched across from these wires to the instrument. The trolley wire of the Louisville Railway Company was stretched along the street on the opposite side, and next to the house, but was several feet lower than the telephone wires, so that the wire which was stretched across from the telephone wires to the house crossed the trolley wire, and was several feet above it. Wight had been engaged in the business some ten months. The house set about 10 feet back from the pavement. The wire ran from the telephone pole to the corner of the house, and then back with the house to the dining room, which was two or three rooms back, and the instrument was in the dining room. They took out the instrument and disconnected the wire from the house at the point

where it entered the dining room, but had not taken it off the front corner of the house. At this point Wight said to Goldstein that he would go up the pole; the purpose being to cut the wire off at that end on the street. Goldstein then went to the pole, and Wight, supposing that he was going up the pole, went back and took out the ladder which they had used. Wight then picked up the wire where it had dropped down after it was disconnected from the house at the dining room, and began to wind it up in a coil. In doing this he gave the wire a pull to get it off the front corner of the house. Goldstein had cut it off at the pole in the street; and either from its being cut off, or the pull that Wight gave it, it so came in contact with the trolley wire that Wight received a shock of electricity which burned him terribly and came near killing him. The wire was not insulated, and it was a custom to insulate wires which passed above the trolley of the railway company. Wight knew the wire was not insulated at the point where he picked it up, but he did not know what its condition was between the house and the pole. He brought this suit to recover for his injuries against the telephone company. Upon a trial of the case before a jury, the court instructed the jury peremptorily at the conclusion of the evidence for him to find for the defendant; and, his petition having been dismissed, he appeals.

It is insisted for the plaintiff that the master is responsible because the wire was not insulated and Wight received his injury by reason of the absence of insulation. The proof shows that wires like this, when passing about heavily charged wires like the trolley, should be removed either by the men using insulated pinchers or by making a coil in the wire

and tying a rope in this and pulling the wire down
with the rope. It is also shown that they had with
them a rope for this purpose. If this method of get-
ting the wire down had been followed, there would
have been no danger in handling it. Wight's own
evidence shows that he knew that Goldstein had gone
up the pole to cut off the wire, and that he knew that,
when the wire was cut off from the pole, it was lia-
ble to fall down over the trolley. If the wire had
been insulated, the insulation would only have been
there to protect it from the trolley; the purpose of
the insulation being to prevent the wire from being
charged with electricity in case it sagged down and
touched the trolley. The purpose in using the in-
sulated wire was not to protect it when cut off and
pulled about in being taken down. Although the
wire might have been insulated above the trolley,
still when it was cut off by Goldstein, and jerked as
it was by Wight, a part of the wire which was not in-
sulated might have come in contact with the trolley.
What part of the wire in fact came in contact with
the trolly, or just how the circuit was made, is not
very distinctly shown by the proof. If Goldstein
was negligent in cutting off the wire, and letting it
drop down over the trolley, he being a fellow servant
of Wight, the master is not liable to Wight for the
consequences of his negligence. Wight could see
that the wire where he had it was not insulated, and
Goldstein could also see that it was not insulated at
the pole, and they both knew the trolley was there,
and both understood the danger from the wire com-
ing in contact with the trolley so as to make a con-
nection for the electricity. The proximate cause of
the accident was the failure of these men to take
the wire down in the manner provided for them with

a rope. The danger was before their eyes, they could but know it, and it was incumbent upon them in handling this wire, which of necessity would come down upon the trolley when cut off at the pole to take the precautions which would protect them from the consequences. They had no right to neglect the precautions which the commonest prudence suggested for their own safety; for it is well known that insulation often will not protect from a strong voltage of electricity, where one wire is thus rubbed or dragged against another, and they had no right to rely on an insulation intended only for protection while the wire was up to protect them from danger in pulling the wire down and thus omit all precautions for their own safety. The danger here did not come from the electricity furnished by the telephone company. The power it uses is not dangerous. The danger came from the electricity of the street railway company; and in working around the trolley and pulling the wires across it it was incumbent on these men to use such care for their own safety as the circumstances reasonably demanded.

The rule that the master must use ordinary care to furnish the servant a reasonably safe place to work is subject to the exception that the servant takes the risks resulting from changes made by the servant himself in the ordinary progress of the work. Smith v. North Jellico Coal Co., 131 Ky. 196, 114 S. W. 785. Here the place where the servant was to work was perfectly safe when he began the work. The danger that arose was caused wholly by the act of the servant and his fellow servant in the progress of the work. They alone were directing the work. Servants who pull down or dismantle houses or other structures acting under a general direction to

do the thing, but taking their own course in doing it, assume risks not assumed by servants in putting up new work under the direction of the master. Shearman & Redfield on Negligence, sec. 185; Ballard v. Lee, 131 Ky. 412, 115 S. W. 732. The reason is obvious. The material is old, and the servant may reasonably anticipate it is not in good condition. He must keep his eyes open, and use ordinary care. The insulation on a wire is subject to atmospheric action. Like other things in time, it decays, and, though this wire when put up had been insulated, the plaintiff had no right to assume that it was still in such condition that it could be safely dragged across the deadly trolley. He had been furnished a rope to take these wires down, and if he had used it instead of taking the wire in his bare hands, there would have been no danger. The injury was due not to any fault of the master, but to his own way of doing the work. He and Goldstein were experienced in the business. It was their daily work to take down such wires. To say that the master must furnish perfectly insulated wire for the use of the take-out men when taking out a wire, although he furnishes a rope with which the old wire may be safely handled, would be to forget that the reason in many cases for taking out the wire is that it is old or for some reason may not be safely used. It is true Wight testified that the rule was to use insulated wire from the pole on one side of the trolley to the object to which the wire was fastened on the other side of it, and that so the fact that the wire where he took hold of it was not insulated was not notice to him that the wire was not insulated in the street. We do not rest our judgment here. We rest it on the ground that the danger was wholly created by him and Goldstein; that, knowing

the existence of the deadly trolley, he failed to use the rope in pulling down the wire but undertook to handle it with his bare hands; and that he can not complain of the master because the wire was not so insulated that it might be safely pulled over the trolley. Cin., etc., R. R. Co. v. Zackary's Admr, 106 S. W. 842, 32 Ky. Law Rep. 678; Shemwell v. Owensboro, etc., R. R. Co., 117 Ky. 567, 78 S. W. 448, 25 Ky. Law Rep. 1671; Trosper v. East Jellico Coal Co., 122 S. W. 205.

Judgment affirmed.

CASE 39.—ACTION BY CHARLES HALEY AGAINST THE PRICE & LUCAS CIDER & VINEGAR COMPANY.— March 1, 1910.

Appeal from Jefferson Circuit Court (Common Pleas Branch, Third Division).