### McCarty, Administrator v. Louisville & Nashville Railroad Company.

(Decided March 21, 1924.)

#### Appeal from Fleming Circuit Court.

1.   Master and Servant—Safe Place Doctrine Held Inapplicable to Foremen of Men Engaged in Making Place Safe.—Where railroad company was engaged in making the roof of a tunnel safe by removing wooden supports and replacing them with concrete, the

safe place doctrine did not apply to death of foreman from falling rock, under the Federal Employers' Liability Act (U. S. Comp. St., sections 8657-8665); the deceased being a vice principal whose duty it was to inspect the roof and to see that proper precautions were taken for the protection of his men as well as himself, and the company owing him no duty to employ other men to make the place safe for him while he was so engaged.

2. Master and Servant—Foreman's Death Held Not Due to Negligence of Men.—Death of foreman of men working in a railroad tunnel from falling rock held not due to any negligence of his men in removing one prop before placing another, so as to authorize recovery under the Federal Employers' Liability Act (U. S. Comp. St., sections 8657-8665), where he was warned that the rock was dangerous in time to have gotten from under it.

B. S. GRANNIS, C. B. MORFORD and R. J. BABBITT for appellant.

WOODWARD & WARFIELD and O. R. BRIGHT for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Whether in this action, brought under the federal Employers' Liability Act by C. E. McCarty, administrator of Rufus Vaughn, against the Louisville & Nashville Railroad Company, to recover damages for the death of his intestate, the trial court ruled correctly in directing a verdict in favor of the railroad company is the only question presented on this appeal.

The facts are these: The railroad company, an interstate carrier, was engaged in reconstructing a tunnel on its road in Madison county by removing the wooden supports and replacing them with concrete. The tunnel was about six hundred feet long, and two gangs of men, one working from the north and the other from the south, were employed at the same time. Vaughn was night foreman, and he and his men went to work at three o'clock p. m. and quit at eleven o'clock p. m., except on Saturdays, when they went to work at eleven o'clock a. m. and quit at six p. m. The wooden lining in the tunnel consisted of a system of bents made of timbers twelve inches square and standing about twenty-four inches apart. On top of the slanting pieces and level cap were laid two-inch timbers which made a solid covering. To put in the concrete lining it was necessary to remove about two feet of dirt, slate and rock from above the wooden lining. The concrete was mixed and lifted by

machinery and derrick to the top of the tunnel car about sixteen feet high. The tunnel car was then pushed into the tunnel, where the men were at work, and the materials shoveled from the top of the tunnel car to the scaffold. On Saturday afternoon, McHargue, Taylor and Parrett, three men working under Vaughn, while working in the northern or middle opening, discovered in the roof a rock about three feet wide, two and one-half feet thick and five feet long. Realizing that there was danger of the rock's falling, the men debated as to whether they should take the rock down or support it with a prop. Finally they yielded to the views of Parrett, who was more experienced in such matters, and concluded to prop the rock, which they did by using a short cross-piece and a leg which rested on the second bent from the concrete. Vaughn was not present when this occurred. On the following Monday, Parrett, McHargue and Taylor ran the tunnel car into the tunnel and resumed work at the same place. At that time the stone was supported by a short cap. What occurred then is best shown by the testimony of Parrett, Taylor, and McHargue.

On direct examination Parrett's testimony was as follows:

"Q. 70. Then what did you start to do? A. Vaughn came up and—

Q. 71. From where did he come? A. We were getting ready to knock out the timber and put in a long piece.

Q. 73. Well, now, when he came up there, had the short pieces been taken out? A. No, sir. He came up there and said, 'I want you to start both sides,' and so we knocked out the short timber first to put in the long timber, and he came over there and says, 'Where are you going to put it?' and I said, 'Right under this rock, it is dangerous,' and he said, 'Yes, that is the place to put it,' and McHargue or Taylor said, 'That rock has dropped down,' and I said, 'Yes, it has;' then he got under the rock, picking off some little shales on the slate; he had not been under it over two minutes until the slate fell."

On cross-examination his evidence was as follows:

"Q. 40. I understood you to say you told Mr. Vaughn that this rock is dangerous? A. He asked me where are you going to put this timber? I said

'right under this rock, where it is dangerous.' James McHargue or Taylor one said, 'Yes, that rock has dropped down.'

Q. 41. Were they talking to Mr. Vaughn? A. There were no names called.

Q. How close were you and Mr. Vaughn? A. Four or four and one-half feet.

Q. Was you that close when you called his attention to the rock? A. Yes, sir.

Q. How close were you to the rock when you were talking about the rock? A. Nearly under the edge of it.

Q. And Mr. Vaughn was within four feet of you? A. Yes, sir.

Q. How close was Taylor to the rock? A. About the same.

Q. All standing four or five feet of each other, and discussing about the dangerous condition of the rock? A. Yes, sir.

Q. I understand you to say that Mr. Vaughn was standing with one foot on the tunnel car, and one foot on a post, that timber was one of the posts that had formerly propped the side of the tunnel. A. Yes, sir.

Q. Was that a temporary position? A. Yes, sir.

Q. Did he move from that position while he stood there picking shale from this rock? A. Yes, sir.

Q. As you called his attention to this rock being dangerous, he then began to examine it with his hands, did he not? A. Yes, sir.

Q. Did he say anything about its being dangerous or not? A. He said, 'Yes, that is the place to put the timber.'

Q. Why did you call his attention to this rock being dangerous? A. It was sticking out and it looked bad.

Q. What was your purpose in telling him about it? A. I wanted to get the timber in before it fell.

Q. Did you have any other purpose in telling him? A. I don't know as I did.

Q. Did you also tell him for his own purpose, so that he could get out of the way? A. Why, sure.

*  *  *  *  *  *  *

Q. Did James McHargue or Taylor, when they spoke of this rock being dangerous in the presence of Mr. Vaughn, was he close enough to hear what they said? A. Yes, sir.''

On direct examination Taylor's evidence was as follows:

''Q. What did he (Vaughn) first say when he came up on that tunnel car? A. I understood him to say for us to work from both sides.

Q. Then after he had told you to go to work on both sides, which side did he go to first to see about? A. I don't know where he went to, I didn't notice.

Q. Was he on your side with you? A. Not then.

Q. Did he come on your side later? A. Yes, sir.

Q. And was killed on your side? A. Yes, sir.

Q. How long do you think he had been there on the side where you were at work when he was killed? A. Well, I don't know; of course it seemed like a long time, might not have been so long as it seemed, might not have been over two minutes; of course I don't know.

Q. After telling you to go to work on both sides, he went somewhere; while he was gone, what was done to that rock? A. We knocked the post out.

Q. Who knocked that out? A. I don't remember.

Q. What were you preparing to do? A. Put long timber in.

Q. Did you have the long timber up there? A. No, sir.

Q. When he came over to you just before he was killed, I ask you to state what was said and what you all did? A. I don't know as I could tell what was said; as well as I remember, some one knocked the post out; I told Ed. Owens not to get under there, that it was dangerous.

Q. That was before he came back over to your side when you knocked the post out? A. Yes, sir.

Q. After he came back, what was said and done? A. He asked where we were going to put

the long timber and we showed him where we were going to put it, we were talking about it being a bad looking rock; he was standing with one foot on the tunnel car and the other on a post or the side of the tunnel.

Q. What was said?  A. Me and McHargue was talking about the rock and the timber would be all right where we started to put it; we told him we wanted him to get out from under it, it was giving down, and he still stayed under it, and I bent over and could see a crack come in, and said 'Yes, it is giving down.'

Q. What point in that did the rock let loose and fall?  A. It had not fell yet.

Q. How soon did it fall?  A. A half minute; as he would not get out from under it, I could not tell him when it started.

Q. When the rock let loose it took him down? A. Yes, sir.

Q. Did it take you also?  A. No, sir.  I stayed on the scaffold.

Q. You were higher up than he was?  A. Yes, sir.

Q. You think he could see the crack in that rock from where he was?  A. Well, I don't know; I believe he could."

On cross-examination he testified as follows:

"Q. After you had gone on the tunnel car, and before you had done any work, Mr. Vaughn came up and gave instructions what to do?  A. Yes, sir.

Q. His instructions were for the men to work on both sides of the tunnel?  A. Yes, sir.

Q. Something was said about this rock at the time, was there not?  A. I don't remember.

Q. Did you not ask Will Parrett what he was going to do?  A. Yes, sir, where he was going to put the timber.

Q. That is the long timber?  A. Yes, sir.

Q. Where was that long timber at that time? A. Down on the tunnel, on the car on the track crossways of the track.

Q. You mean right close to the tunnel car?  A. Yes, sir.

Q. Bill Parrett told him he was going to put it in under this particular rock?  A. Yes, sir.

Q. What did Mr. Vaughn say to that? A. Told him he thought that would hold it.

Q. That was his opinion? A. Yes, sir.

Q. Mr. Vaughn was on top of the tunnel car was he not? A. Yes, sir.

Q. And how close to you? A. Four or five feet.

Q. You did not have any difficulty in understanding what he said? A. No, sir.

Q. You heard what Bill Parrett said to him? A. I heard the discussion.

Q. Was there anything said about the leg? A. Said it must be knocked out.

Q. Mr. Vaughn? A. I don't think he did.

Q. Which one said it? A. I don't remember.

Q. But they were talking to each other about how to do the work? A. Yes, sir. Where to place the long timber.

Q. And how to put it under there? A. Yes, sir.

Q. Was it then that Mr. Vaughan left there and went away, and afterwards came back? A. That was the last time he was there.

Q. You stated that you told Mr. Vaughn before this leg was knocked out or after this leg was knocked out that this rock was dangerous. was it before or after? A. It was after if was knocked out.

Q. At that time Mr. Vaughn was on the tunnel car? A. Yes, sir.

Q. Was he trying to make an examination of this rock? A. He was looking at it.

Q. You called to him there and told him it was dangerous? A. I told him it was giving down.

Q. Did you tell him to get out of the way? A. McHargue first told him it was giving down and I told him right afterwards.

Q. Did you think the rock was going to fall? A. I knowed it would fall, but I did not know exactly how long it would hold.

Q. How close were you to Mr. Vaughn when you told him that the rock was giving down? A. Not over six feet.

Q. How close was McHargue to him when he told him? A. Closer than I was.

Q.   Was he close enough to put his hand on him?  A.   Seems to me that he could.  I don't remember.

Q.   Could a man examine that rock from looking up underneath?  A.   He could see under the bottom of it.

Q.   Where was the crack in this rock?  A.   It was up at the top.

Q.   Did you tell Mr. Vaughn that the rock had a crack in it?  A.   McHargue did, I did not.

Q.   Do you know why he stood under this rock after both of you had told him?  A.   No, I don't know why he stood there.

Q.   He could have gotten out from under it?  A.   Yes, sir, by stepping out right then.

Q.   If he had wanted to make an examination of this rock, he would have had to gotten up where you were, would he not?  A.   It would have been better; he could have seen more.

Q.   You had carbide lights in there, McHargue had a light on his cap, did he not?  A.   Yes, sir.

Q.   You do not know just how long Mr. Vaughn had been up on this tunnel car and talking about this rock, and giving orders until he was killed?  A.   No, sir.

Q.   About four or five minutes?  A.   Maybe longer; I don't know.

Q.   There was no noise going on when you were talking?  A.   Nothing only the lights blowing.

Q.   No noise out of the ordinary?  A.   No, sir.

Q.   You could hear everything Mr. Vaughn said?  A.   Yes, sir.

Q.   And all Mr. Parrett said?  A.   Yes, sir.

Q.   And all Mr. McHargue said?  A.   Yes, sir.

Q.   And all Mr. McHargue said?  A.   Yes, sir.''

McHargue's testimony on direct examination was as follows:

"Q.   How long had he been on your side where the dangerous rock was before he was killed?  A.   He hadn't been there over three minutes, I don't think, if that long.

Q.   Had the short legging been taken out from under that when he came up on the car?  A.   Yes, sir, they just knocked it out.

Q. Who knocked it out? A. Mr. Parrett, I think, knocked it out, the legging out there, and Mr. Taylor knocked the one out from the other end.

Q. Now, just what happened when Mr. Vaughn came over to your side? A. Mr. Vaughn came over there and says, 'What are you fellows going to do here, where are you commencing at?' and we says, 'We are going to put a timber under this rock right here and start here.' He says, 'I think it would be a good idea,' and he went kind of around under the rock, looking, and I says, 'That rock is dangerous— I talk very low—and says it is give down a little,' and he didn't seem to understand me. They was making a right smart of noise, dirt falling on the other side of the car, and Mr. Taylor says, 'Yes, that rock is give down a little, and I believe I would get out,' or something like that, and he made one step back and the rock fell.

Q. From his actions do you think he heard what you first said, or did he seem to hear what you said to him? (Defendant, by counsel, objects to the question.) A. He didn't seem to understand me.

Q. You say there was a good deal of noise just across the tunnel from you, in the other half of the tunnel, how many men were working there. A. There was about three.

Q. What were they doing? A. They were scabbing down stone, and it was falling on the tunnel car.

Q. That tunnel car was just a timber platform? A. A platform, yes.

Q. When Taylor spoke to him, he started to step from under it and it fell? A. Yes, sir.

Q. Could he see the seams and see that the rock had let down a little from where he was down below? A. No, he was under it.

Q. He couldn't see it was dangerous? A. No.

Q. Now, had he ever been there where the rock was at any time when you were there, from the time it was first discovered to be dangerous, on Saturday, until he came there a minute or two before he was killed? A. He was up there Saturday evening, but we hadn't got down to the rock, and he never come back any more until he come and it fell on him.''

On cross-examination he testified as follows:

"Q. Didn't you have a piece of timber 14 feet long to put in there? A. We had the timber to put in there.

Q. How were you going to place that timber in there? A. Well, we were going to bring it up and work it in.

Q. Going to put it under this rock, weren't you? A. Yes, sir.

Q. Under this particular rock that fell. Now, didn't Mr. Vaughn come up before you had gotten the timber in there and talk to you fellows to see what you were going to do? A. Yes, sir.

Q. And you told him you were going to put this timber under there? A. Mr. Parrett told him we were going to put the long legging under it. He was right close to it. Walked pretty much under it.

Q. Wasn't he standing on the scaffold on the tunnel car and talking to Mr. Parrett and you men, you and Mr. Jim Taylor, and didn't he ask you what you were going to do? A. He stopped right there and had a few words about it and said that was a pretty good idea.

Q. He said that after Mr. Parrett told him he was going to put this timber under the rock? A. Yes, sir, said put that right in here and make this safe.

Q. Do you mean underneath this rock that was loose? A. Yes, sir, he meant under the rock.

Q. He knew where you were going to put the timber? A. He told us where to put it.

Q. Mr. Vaughn told you? A. Yes, sir.

Q. Now, describe to the stenographer where he told you to put this timber? A. Told us to put it under the rock and brace it up.

Q. The rock hadn't fallen at that time? A. He hadn't hardly stopped, just walked right in on under it, and I said, 'That rock is give down,' and Mr. Taylor said, 'Yes, it was dangerous,' and he made one step back and the rock fell.

Q. Wasn't he standing with one foot on the tunnel car and one on the piece of timber, standing with his hand on this rock, picking shale from it? A. He was under the rock.

Q. Sure he was under the rock. He was about half bent, looking out where you were putting the timber in and giving you directions where to put the timber? A. Yes, sir.

Q. Well, could you have put the timber in there with the legs under it, without taking them out? A. No, not handy; didn't have the room.

Q. What kind of light did you have in the tunnel? A. Carbide and acetelyne.

Q. Did you notify Mr. Vaughn that this rock was dangerous to warn him of the danger in going underneath it? A. I spoke to him but he didn't seem to hear me.

. . . . . .

Q. Why didn't you tell the man you saw him go underneath it? A. Well, he was talking, instructing us men, and I didn't want to seem bossy. I tried to call his attention and he didn't seem to hear me, and then Mr. Taylor called his attention.

Q. You don't know whether he heard you or not, do you? A. I don't know that he did.

Q. Do you know whether Mr. Parrett heard you or not? A. I don't know.

Q. Do you know whether Mr. Taylor heard you or not? A. Mr. Taylor heard me and he called his attention.

Q. How far was Mr. Vaughn standing from you when you told him? A. O, between two and three feet; something like that.

Q. Had you known that the long timber had been ordered to put under this rock? A. Yes, sir.

Q. Did you tell Mr. Vaughn that? A. No, some of the others did.

Q. What did he say about putting that timber under that rock? A. Said it was the thing to do.

. . . . . .

Q. Well, didn't Mr. Vaughn have as good eyes as you did? Couldn't he have seen it if he had looked? (Plaintiff, by counsel, objects to the question.) A. Yes, sir, if he had looked for it he could, I guess.

Q. I want to ask you, if before he went under this rock he didn't have information from you and from Jim Taylor and Neal Parrett that this rock was not safe? A. Yes, sir, we all told him that this rock was not very safe.''

The safe place doctrine does not apply. The company was engaged in making the roof of the tunnel safe. In the work of excavation certain dangers were created during the progress of the work. Vaughn was a vice-principal and represented the company in the performance of the work. It was his duty to inspect the roof and to see that proper precautions were taken for the protection of his men, as well as himself, and the company owed him no duty to employ other men to make the place safe for him while he was so engaged. Ballard & Ballard Co. v. Lee's Admr., 131 Ky. 412, 115 S. W. 732; Boyd v. Crescent Coal Co., 141 Ky. 787, 133 S. W. 777; Williams Coal Co. v. Cooper, 138 Ky. 287, 127 S. W. 1000.

The foregoing doctrine is practically conceded, but it is insisted that appellant was entitled to recover because of the negligence of Parrett, Taylor and McHargue. The argument is that the federal Employers' Liability Act abolished the common law rule that exempted the employer from responsibility for the negligence of a fellow employe, and had the effect of placing a co-employe's negligence, when it is the ground of the action, in the same relation as that of the employer upon the matter of assumption of risk (Mondou v. New York, N. H. & H. R. R. Co., 223 U. S. 1, 56 L. Ed. 327; 38 L. R. A. (N. S.) 44; Chicago, R. I. & P. R. Co. v. Ward, 252 U. S. 18, 64 L. Ed. 430), and that McHargue, Parrett and Taylor were negligent in removing the short prop before placing the long timber under the rock. Whether the short prop was removed while Vaughn was there, or during his absence, does not clearly appear, but we shall assume that it was removed during his absence, as there was some evidence to that effect. However, an analysis of the foregoing evidence will show that there is no dispute as to the following facts: Before the men had done any work Vaughn came up and gave them instructions what to do. He was informed that the men were going to put the long timber· under the rock that fell, and he told the men that that was the place to put it, and he thought the timber would hold the rock. He then left to give other directions and when he returned there was considerable conversation about the rock's being dangerous. The rock was sticking out and looked bad, and he was informed that it had dropped down and was giving away. After his attention was called to the fact that the rock was dangerous, he then began to examine

it with his hands. The men were not over four or five feet from each other. Though McHargue was uncertain as to whether Vaughn heard him or not, the other men who were no further away than McHargue heard him, and he had no difficulty in hearing what Vaughn said. Not only so, but McHargue admits that, before Vaughn went under the rock, they all informed him that the rock was not very safe. It is by no means clear from the evidence that it was practicable to place the long timber under the rock before moving the short prop, but even if this could have been done, the mere fact that it was not done was not an act of negligence as to one who was informed of the danger. The evidence leaves no doubt that Vaughn, if he did not already know and appreciate the danger, was actually informed of the danger in time to have gotten out from under the rock. As it was not shown that Vaughn's death was due to any act of negligence on the part of the company or its agents, it follows that the directed verdict was proper.

Judgment affirmed.