## West Kentucky Coal Co., Sturgis Electric Light Co. v. Kuykendall's Admr.

(Decided December 20, 1912).

### Appeal from Union Circuit Court.

Master and Servant—Where Servant is Injured by Disobedience to Orders—Creating Danger Resulting in Injury—Electricity.—A servant who disobeys orders given him, and by reason of his disobe-

dience, creates a danger from which he is injured, and which would not have existed if he had obeyed his orders, cannot recover, unless his superior knew of the peril in which he had placed himself in time to prevent the injury to him.

ALLEN & MILLER and CLAY & CLAY for appellants.

GEORGE S. WILSON and MORTON & MORTON for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE HOBSON—Reversing.

The West Kentucky Coal Company and the Sturgis Electric Light Company operate an electric light plant in Sturgis, Kentucky. They had a crew of men consisting of Otis Hoover, as foreman, William Kuykendall and Byers Nunn, who for two or three months had been engaged in wiring and installing electric light fixtures in dwelling houses in Sturgis; and on March 28, 1911, were so engaged in the residence of a Mr. Simpson. On that afternoon Hoover directed Kuykendall and Nunn to attach some wires which were to lead out of the Simpson house to the electric light wires leading into Dr. Humphrey's house. They went out to make the attachment. The wires leading into the Humphrey's house were low tension wires carrying 110 volts of electricity, and there were along the street high tension wires carrying 2200 volts of electricity. They did not attach the wires leading from the Simpson house to the wires leading to Dr. Humphrey's house, but attached them to one of the high tension wires carrying 2200 valts of electricity. The next morning after they came back to work, and when they were getting ready to make some attachments in the Simpson house, Kuykendall picked up the two wires which he and Nunn had attached the evening before, holding one in each hand, and was instantly killed by the electricity. This suit was brought against the companies to recover for his death. On the first trial of the case there was a verdict in favor of the plaintiff for $15,000.00. The court granted a new trial; and on the next trial a verdict was rendered and judgment entered for $12,000.00. The defendants appeal.

The only question we deem it necessary to consider on the appeal is whether the court should have instructed the jury peremptorily to find for the defendants. The foreman, Hoover, was sworn as a witness by the plaintiff and his testimony is practically the only

evidence offered by the plaintiff to make out his case. Hoover's testimony so far as material put in narrative form, is as follows: "As near as I can remember, I told Will Kuykendall, I am not sure whether Nunn was in there or not, but I told him to go out and connect the wires that go into Dr. Humphrey's residence. I had no conversation with him, only simply the directions I gave him. He did connect the wires at the point where he was directed to connect them. I knew there were three wires coming up that lead, and one of them was an arc light one. The wire that they connected to did not run into Dr. Humphrey's house; I never gave a thought about it at the time. I knew that Dr. Humphrey's house wires came up that lead, but I never thought but that these other wires went in there at the time. Taking the usual arrangement it would look like the wire they connected to was a secondary wire or low voltage wire. I saw Mr. Nunn out on the pole while he was on the pole. I don't think they had time to make the connection to the wires up at Dr. Humphrey's residence while they were gone. When I left the Simpson house that evening, I passed under the pole where they had made the connection and passed under it the next morning. When Kuykendall came back to the house while Nunn was still up on the pole, he came in where I was laughing, and said, 'I have got Sandy scared. I told him he was working on 2200.' I said he ought to know better; we never run 2200 into a house. He went to the window and said to Nunn, 'All right, go ahead, you are only working on 110.' Kuykendall and I about a month prior to this accident or six or eight weeks, did some work on the pole near Dr. Humphrey's house; changed a cross arm and the wires ran the same then as at the time Mr. Kuykendall was killed. At that time the wires were attached there and came directly from that into Dr. Humphrey's residence. In working there we were bound to see where the wires went. I instructed Kuykendall to connect with the wires that went into the Humphrey residence, and if he had gone there he could have seen the wires. I did not discover that the connection had been made to the high tension wire until after the accident. He knew that low voltage wires were used in electric light wiring, and furnished current to the residences and that high voltage was reduced by means of a transformer."

Nunn testified in substance that he was not present when Hoover talked to Kuykendall; that Hoover simply

told him to go with Kuykendall.  There was a pole back of the Simpson house, also another pole at Main Street, about 150 feet away, and a pole near the Humphreys' residence, about the same distance away.  Nunn said that when they got out to the pole back of Simpson's house Kuykendall went down to Main street, and when he came back told him to connect with the wire there; that is, the wire on each side of the pole, and he did this; that he went up on the pole and did the work while Kuykendall stood on the pavement below, and that he worked under Kuykendall's directions.

If Kuykendall, instead of going to Main street had gone to the other pole which was about the same distance away, he would have seen the wires leading into the Humphrey house, and could have made the connections as he was directed to do by Hoover.  If the connection had been made thus, there would have been no danger in the wires the next morning, and he would not have been killed.  He had worked on the pole next to the Humphrey residence with Hoover, about six weeks before, and knew that the wires went from this pole into the Humphrey house.  He seems to have assumed that these wires came from Main Street, and for that reason directed Nunn to make the connection as he did, when as a matter of fact the wires that lighted the Humphrey house came from Adams Street, and the wires that came from Main Street were all high tension wires.  The proof leaves no doubt that Kuykendall knew the difference between high tension and low tension wires, and that the entire cause of the trouble was his not making the connection to the wires which lead into Dr. Humphrey's house.  It is also evident that he would not have made the mistake if he had gone to the pole where he had worked a few weeks before and looked at the wires there.  It is therefore insisted for the defendants that his death was due to his own failure to obey his instructions and his own want of care in failing to make the connection to the wires to which he was told to make it.  But it is insisted for the plaintiff that the foreman, Hoover, knew that he had made the connection at the pole back of the Simpson house and that this was notice to him that the connection had not been made to the right wires.  These facts also appear: The night after this connection was made, the lights went out on that lead.  The superintendent, the foreman, Hoover, Kuykendall and Nunn were all out looking for the trouble.  They found the

trouble to be in the cut out block just across the street from this pole. They re-fused this cut out block, put the plug back in the block and the trouble disappeared. It is insisted that these facts as well as some things that happened at the Simpson house the next morning, were sufficient to put Hoover on notice that the connection had not been made right. But as a matter of fact he did not so conclude at the time. All the things that happened might have come from one of two different causes, and it was only after the accident that they were ascribed to the true cause. So summing the whole case up, we think the proximate cause of the unfortunate man's death was his making the connection to the wrong wire, and the proximate cause of this was his disobeying his instructions. It is insisted that there was negligence on the part of appellant in that Kuykendall was not warned or instructed as to the danger in handling the wires. But his own declaration shows he understood the danger. The thing he did not know was what wires ran into the Humphreys' house and this he should have learned before making the connection. They all knew there were high tension wires on this lead; they all knew that there was danger from these high tension wires. Kuykendall knew the Humphrey house very well; he had worked only a few weeks before on the wires leading into that house; and when he was told to make the connection to the wires leading into the Humphreys' house, he understood perfectly what he was told to do. His death was due to his assuming that the wires which came from Main Street went into the Humphrey house; without going to the other pole and looking and learning for himself what wires went into the Humphrey house. It is true Hoover knew he had made the connection back of the Simpson house, but Hoover at the time did not have in his mind how the wires which went into Dr. Humphrey's house, ran.

The rule is that if a servant disobeys his orders and by his disobedience brings a peril upon himself which he would not otherwise have encountered, the master in a case like this is not liable, unless he learns of the danger in which his negligence has placed him in time to avoid injury to him. (Cleveland, &c., R. R. Co. v. Workman, 90 Am. St. Rep., 602; Runions v. Keller, &c., 141 Ky., 827; Straight Creek Coal Co. v. Haney's Admr., 27 R., 1117; Cincinnati, &c., R. R. Co. v. Yocum's Admr., 137, Ky., 117, 143 Ky., 700.) In handling so dangerous

and instrumentality as currents of electricity of 2200 volts, the utmost care must be used by those having charge of it, and a corresponding degree of care should be used by the servants for their own safety in handling it. A disobedience of orders not only endangers themselves, but endangers the lives of others. By the act of Kuykendall in making the connection to the wrong wire, the lives of a number of other persons were placed in imminent peril. His personal representative stands in no better position than he would if he had survived and brought an action for his injuries; and certainly one who puts others in such danger by disobedience of orders should not be allowed to recover for an injury which he himself received simply by reason of his failure to obey his orders, and make the connection to the wires leading into the Humphrey residence; a thing he would have had no difficulty in doing if he had walked down to the other place, and looked at the wires before making the connection at the pole back of the Simpson house. We therefore conclude that under the evidence the court should have instructed the jury peremptorily to find for the defendant.

Judgment reversed and cause remanded for further procedings consistent herewith.