## Cumberland Telephone & Telegraph Company v. Magness' Administratrix.

## Magness' Administratrix v. Cumberland Telephone & Telegraph Company.

(Decided December 9, 1913).

## Appeals from Graves Circuit Court.

1. Master and Servant—Assumed Risk of "Trouble" Man for Telephone Company.—A "trouble" man for a telephone company assumes the risk of coming in contact with a live wire when he knows, or has information, that a telephone he is sent to repair was injured by a live wire.

2. Master & Servant—"Trouble" Man for Telephone Company—Negligence of Company.—The fact that a telephone company may be guilty of negligence in failing to have its wires properly insulated at places where they are liable to come in contact with heavily charged electric wires, does not diminish the risk assumed by the "trouble" man or lessen the care he must take to save himself from injury when he is advised before receiving the injury that the trouble he was sent to remedy was caused by a live wire.

3. Master and Servant—"Trouble" Man—Duty of Inspection and Examination.—The business of a "trouble" man imposes on him the duty of inspection and examination, and he has no right to assume that wires at places where he is sent to repair telephones are properly insulated or protected when he knows, or has reasonable grounds to know, that the trouble he is sent to adjust was caused by the fact that the wires were not properly insulated at a point where they were liable to come in contact with heavily charged electric wires.

WHEELER & HUGHES for Telephone Company.

SPEIGHT & DEAN for Magness' Administratrix.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming the judgment on one appeal and dismissing on the other appeal.

Lemuel Magness, an employe of the Cumberland Telephone and Telegraph Company, was killed by a telephone wire that had come in contact with one of the electric wires of the Mayfield Water and Light Company. To recover damages for his death his administratrix brought this suit against the Cumberland Telephone and Telegraph Company and the Mayfield Water and Light Company, and on the first trial of the case the trial court directed a verdict in favor of both companies, but after-

wards granted the plaintiff a new trial. On the second trial of the case a directed verdict was ordered in favor of the Cumberland Telephone and Telegraph Company, but the case went to the jury as against the Water and Light Company, and a verdict was obtained against it.

One of these appeals is prosecuted by the Cumberland Telephone and Telegraph Company from the order of the lower court granting the motion for a new trial, and the other is prosecuted by the plaintiff below from the order on the second trial directing a verdict in favor of the Telephone Company.

As we have reached the conclusion that the ruling of the trial court on the last trial was correct, it does not seem necessary to consider the correctness of the ruling granting a new trial except to the extent of saying that as the evidence was the same on both trials, the new trial should not have been granted.

The evidence shows that the deceased, who was about 28 years old at the time of his death, was employed as "trouble" man by the telephone company and it was a part of his duty as "trouble" man to attend to any trouble arising in connection with the wires and telephones of the company. He had only been acting as "trouble" man for about three days before the day of his death, but he had worked quite a good deal as a lineman for telephone companies and had assisted in erecting the telephone plant in Mayfield. Aside from this experience with telephones, he took a course in a telephone school located in Nashville, Tennessee, maintained by the telephone company for the purpose of instructing employes in the various duties of the telephone service, and the course of instruction embraced the duties of a "trouble" man.

It is also shown without contradiction that on the day he was killed he went into the office of the telephone company and while in the office was informed that L. O. Stephenson's telephone was out of fix. The chief operator, Miss Myrtle Wright, after stating that complaints from patrons of the company were registered on cards or tickets, relates as follows what took place:

"He came in and went to the box where those tickets were, took up the tickets and called them over, when he says, 'L. O. Stephenson.' I says, 'Mr. Stephenson says that his telephone must be fixed immediately in preference to any body else.' He says, 'Is Mr. Stephenson any better than any one else?' I says, 'He is when it comes to having his telephone fixed.' Q. Anything said about

the drops? A. Yes, sir. Q. Tell what you said. A. I told him it was burned out by a live wire. Q. You told him it was burned out by a live wire? A. Yes, sir.''

E. E. Cranford, manager of the telephone company, testified as follows: ''Q. Tell the jury whether you had any conversation with him on the day just preceding his death relative to L. O. Stephenson's telephone? A. Yes, sir. Q. Tell what took place between you and all about it. A. He passed through my office and I asked him where he was going, and he said to L. O. Stephenson's. I says, 'Be very careful; I am pretty sure that is on a hot wire.' Q. He told you he was going to L. O. Stephenson's A. Yes, sir. Q. You told him to be very careful, you was pretty sure it was on a hot wire? A. Yes, sir. Q. You didn't tell him not to fix it? A. No, sir. Q. What were his duties? A. He was a ''trouble'' man. Q. What is a ''trouble'' man? A. To fix all breaks or anything that is the matter. Q. You just told him to be careful, that it was a hot wire? A. I heard Miss Myrtle say, and L. O. Stephenson also told me that he was pretty sure that it was burned out. Q. You didn't know anything about the condition of the wires down there? A. No, sir.''

Raines, who had been working for the company several years, and who was the immediate foreman of Magness, testified: ''Q. Who was he working for last May when he got killed? A. Working for me. Q. Did you see him on the day that he was killed? A. Yes, sir. Q. How long before he was killed did you see him? A. About an hour and a half. Q. How far were you working from him when he was killed? A. Something near a half block or a little over. Q. Did he come to where you were working? A. He came over to where I was taking a telephone out to move it down to another house. Q. What did he have with him, if anything? A. He had a receiver. Q. Tell the jury what a receiver is. A. Thing you listen through. Q. What did he say to you about the receiver? A. He says, 'Looks like this has been in a heavy light wire, or something another.' Q. What receiver was he talking about and where was he working? A. I don't remember whether he told me where he was working or not. Q. Where did that receiver come from? A. L. O. Stephenson's. Q. He told you that it looked like it had been on a heavy wire or something? A. Yes, sir. Q. Where did he go then, after he told you this? |A. I suppose he went to the office.''

This witness further testified that he discovered him dead on the telephone pole opposite the residence of Stephenson about fifteen minutes after this conversation.

It is further shown by the evidence that at the place decedent was killed the poles and wires of the water and light company are on the east side of the street and the poles and principal wires of the telephone company are on the west side of the street; that the street at this on the west side of the street opposite Stephenson's residence, which is on the east side of the street, is about thirty feet from the street; so that the telephone pole on the west side of the street opposite Stephenson's residence was about ninety feet from his residence. From the principal wires of the telephone company at this pole there was a drop wire leading into Stephenson's house, and this drop wire, in its course from the telephone pole to Stephenson's house passed between the wires of the water and light company on the east side of the street. It is further shown that neither the drop telephone wire nor the wires of the water and light company were insulated at or near the point where the telephone wire passed between the wires of the water and light company, and that in ordinary conditions the telephone wire would hang eight or twelve inches from the electric wires.

The deceased when found was hanging dead on the cross-arm of the telephone pole and from the marks on his body it is apparent that in some manner not explained by the evidence he caused the drop wire to come in contact with the electric wire at a moment when he had hold of this drop wire or it was touching his body. When the telephone wire thus came in contact with the electric wire the deadly current of the electric wire was imparted to the telephone wire and transmitted by it to the person of the deceased, killing him instantly.

The deceased knew before he undertook to adjust the trouble with Stephenson's telephone and before he climbed the telephone pole that the trouble was caused by the telephone wire coming in contact with the electric wire, and he could not help but know that the drop wire on the telephone pole that he climbed which led into Stephenson's house was the only telephone wire that could have come in contact with the eletric wire and the only telephone wire that could have caused the trouble in Stephenson's house, as there was no other wire except this one leading from the principal wires of the telephone company to Stephenson's house.

Every person of ordinary intelligence in the telephone service knows the meaning of the words "hot wire" and "live wire." They know that a "live wire" and a "hot wire" are dangerous, and they know the risk they assume in coming in contact with them except in the manner provided for handling them, and this knowledge must be imputed to the deceased who had not only attended a school where he was instructed on the subject of the danger attending the handling of live wires and hot wires, but had been told by two persons immediately preceding his death that the trouble with Stephenson's telephone was caused by a hot wire. In addition to this, he had previous to his employment as a trouble man been engaged in the telephone service.

Under these circumstances, there is no escape from the conclusion that the deceased was fully advised of the dangerous conditions surrounding the telephone he was directed to repair and the cause that produced the condition. These material facts being undisputed, it necessarily follows that the deceased assumed the risk attending the repair of this telephone, and that his death was brought about by his failure to observe the care necessary in dealing with so dangerous a situation.

It is true under the rule laid down in Overall v. Louisville Electric Light Co., 20 Ky. L. R., 759, and many other cases, that the telephone company and the electric light company were both guilty of negligence in failing to have their wires so protected at the place in question as to prevent the dangerous condition that produced the death of the deceased, but their negligence did not, under the circumstances of this case, excuse the deceased from exercising the care that he knew was necessary to save himself from injury, nor did it have the effect of diminishing the risk he assumed.

In Bowling Green Gas Light Co. v. Dean, 142 Ky., 678, Dean, an employe of a telegraph company, was killed while in the performance of his duties by coming in contact with a heavily charged electric wire that was on one of the poles of the telegraph company that he had climbed for the purpose of adjusting the wires of the telegraph company. One of the defenses of the light company was that as Dean knew the danger coming in contact with electric wires and was thoroughly familiar with the situation of the wires on this pole, he assumed the risk of injury and voluntarily placed himself in a position of peril or carelessly brought upon himself the injury that

resulted in his death, and therefore there should be no recovery in his behalf. In answer to this we said:

"He owed no duty of inspection or examination. He was only obliged to exercise ordinary care to prevent injury. He had the right to assume that the wires were properly insulated, unless he know or by the exercise of ordinary care in the discharge of his duties could have ascertained that they were not; and, as we have heretofore stated, he was not guilty of negligence in this respect that would defeat a recovery. On the other hand, the appellant company owed to him the duty of keeping its wires properly insulated, and this the jury found it did not do. Dean, of course, knew the place he was working was alive with danger, but there is no evidence that he knew it was more dangerous than it should have been. He did not know that the appellant would expose him to needless peril, or have any information that it had not performed its full duty in making the place as safe as it could have done. He did not voluntarily or otherwise assume any risk except such as resulted from the hazards of the place after it had been made as safe as it could be made."

We adhere to what is said in the Dean case, but the facts of that case are very different from the facts of the case we have. Here the very business of the deceased as trouble man imposed on him the duty of inspection and examination. He had no right to assume or believe that the wires at the place in question were properly insulated, because he knew that the very trouble he was sent to remedy was caused by the fact that the wires were not properly insulated.

It seems to us that this case falls well within the scope of the opinions of this court in Anglea v. East Tennessee Co., 142 Ky., 539; Union Light, Heat and Power Co. v. Young, 141 Ky., 805; Wight v. Cumberland Telephone and Telegraph Co., 137 Ky., 299; Capital Gas and Electric Co. v. Davis, 138 Ky., 628; West Kentucky Coal Co. v. Kuykendall's Admr., 151 Ky., 384; and that the trial court properly directed a verdict in favor of the telephone company.

Wherefore, the judgment on the appeal of Magness' Administratrix is affirmed, but as the telephone company was successful on the new or second trial, and the evidence on both trials was the same, its theory of the case was fully presented by the record on the appeal prosecuted by the administratrix from the adverse rul-

ing on the second trial, and there was no good reason why it should bring up the record of the first trial, and the appeal of the telephone company is dismissed.