**HOME INTERIORS & GIFTS, INC., Appellant,**

v.

**Jesus VELIZ, Appellee.**

**No. 13–84–184–CV.**

Court of Appeals of Texas, Corpus Christi.

April 30, 1985.

Rehearing Denied May 30, 1985.

Paul Q. O'Leary, Brownsville, Wm. L. Hubbard, Harlingen, for appellant.

Rafael Flores, McAllen, for appellee.

Before UTTER and KENNEDY, JJ.

## OPINION

UTTER, Justice.

This is a personal injury case. Appellee suffered serious injuries in a vehicle collision, when a truck driven by Carl Guelker collided with a pickup truck, in which appellee was a passenger. Appellee brought suit against Guelker and Home Interiors & Gifts, Inc. (Home Interiors), alleging that Guelker was "an agent, servant, employee or representative" of Home Interiors who was acting "in the scope of his employment." At trial, Guelker's liability was judicially admitted, and the jury found that, at the time of the accident, Guelker was acting as an employee of Home Interiors. Based upon the jury's findings, the trial court rendered judgment that appellee recover damages from Guelker and Home Interiors, jointly and severally. Only Home Interiors appeals from the trial court's judgment.

In its first and second points of error, appellant Home Interiors contends that there was no evidence or insufficient evidence to support the jury's finding that Guelker was an employee of Home Interiors and (2) that the trial court erred in not granting its Motion for Instructed Verdict, which asserted that the evidence conclusively established as a matter of law that Guelker was an independent contractor. In considering a "no evidence" or "insufficient evidence" point of error, we will follow the well established test set forth in *Glover v. Texas General Indemnity Company,* 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965); *In Re Kings Estate,* 150 Tex. 662, 244 S.W.2d 660 (Tex.1951); CALVERT, *No Evidence and Insufficient Evidence Points of Error,* 38 Texas L.Rev. 361 (1960). In reviewing the trial court's denial of a motion for instructed verdict, we will apply the test set forth in *Lasater v. Convest Energy Corporation,* 615 S.W.2d 340 (Tex.Civ.App.—Eastland 1981, writ ref'd. n.r.e.).

The record reflects that the following undisputed evidence was adduced at trial: Home Interiors is a national direct-selling corporation, which sells home accessories through a "party plan system." Sales are made by a "displayer," who shows Home Interior's merchandise at a party in the home of "hostess" at which time invited guests are given the opportunity to place orders for the merchandise. The displayer sends the orders to Home Interior's Home Office, where the order is filled; and, the merchandise is shipped via a common carrier to a "freight distributor," who receives

the merchandise and then becomes responsible for delivering the merchandise to the displayer. In turn, the displayer delivers the merchandise to customers.

Pursuant to a verbal agreement, Guelker was hired in May 1981 to be a freight distributor for Home Interiors. There was never a written contract between the parties. At the time of hiring, Guelker was told that he was not an employee but was an independent contractor of Home Interiors and that he "could not be construed to be an employee of Home Interiors' in any means." Guelker was instructed not to use Home Interiors' name or logo (e.g., on the side of his vehicles). Guelker was also told (1) that he was expected to deliver merchandise "every week that it's shipped" within forty-eight (48) hours of its receipt, excluding the day of receipt, (2) that, after receiving the merchandise, he would be responsible for the merchandise until it was securely delivered to the displayer and (3) that "it was his responsibility to get the freight delivered 52 weeks a year." Guelker was also given a copy of Freight Instructions for Distributors, which he was instructed to follow.

In performing his function as a freight distributor, Guelker "works his own hours"; Home Interiors did not tell him what hours he must work. Guelker provided his own transportation, hired help and rented warehouse space in order to accomplish his function as a freight distributor. Guelker did not receive and distribute merchandise for anyone other than Home Interiors; although, he was not prohibited from making deliveries for other companies. In addition to his duties as freight distributor, Guelker maintained a full-time job with Continental Trailways. Guelker usually made his deliveries after 5 p.m., and he "normally" delivered merchandise "within 24 hours" after receipt. Since he was not

employed for any specific term, his services could have been terminated at will.

For his services, Guelker was paid monthly by check from the "Home Interiors & Gifts, Inc., Freight Distributors" account the following forms of compensation: (1) a fee of $6.60 per hundred pounds delivered, (2) a service charge of $2.50 for orders having less than $200 in wholesale value and (3) bonuses based (a) per pounds delivered and (b) upon a "growth-plus bonus plan." Also, Guelker received possible "tipping" from displayers for "additional services." In addition, Guelker received from Home Interiors no paid vacation, no paid holidays, no interest in any company profit-sharing plan, no longevity bonus, no insurance (health, life or worker's compensation) benefits and no company-provided vehicle, supplies or uniforms. Home Interiors did not withhold any social security or income tax on behalf of Guelker.

The Freight Instructions for Distributors set forth detailed procedures and policies for freight distributors to follow regarding (1) receiving and inspecting merchandise from common carriers, (2) reporting shortages and damaged merchandise to Home Interiors, (3) delivering merchandise to displayers, (4) returning or reshipping merchandise to Home Interiors, (5) processing freight claims and (6) notifying Home Interiors concerning (a) a freight distributor's change or shipping address, (b) a freight distributor's vacation or absence and (c) anticipated late shipments. The Freight Instructions for Distributors also listed "Home Office Contacts," with whom freight distributors were to deal when contacting Home Interiors' Home Office. The importance of the Freight Instructions for Distributors to our disposition of this case dictates that we copy these instructions in full below.[1]

1. FREIGHT INSTRUCTIONS FOR DISTRIBUTORS

1. Count and inspect your cartons. Have any shortage or damage to cartons noted on your delivery receipt and *signed* by your carrier. It is important to have the driver sign the bill if there is *any* type of a problem. If you do not get a signature you could be held responsible for the damage or shortage.

2. If you are short, call the Home Office and report it to the Communication Center at 386-1149. You should allow at least one day for the shortage to clear.

According to these instructions, once Guelker accepted the merchandise, the re-sponsibility for loss or damage was upon Guelker, and not upon Home Interiors. Af-

3. Send a copy of the Displayer's invoice, list of missing items and a copy of your delivery receipt *noted short* and *signed by the carrier* to the Home Office so we can credit the Display-er and file a claim with the carrier.

4. Follow same procedure for visibly damaged boxes.

FOR CONCEALED DAMAGE

Displayers are to turn all damaged items into you within 10 days as you must notify the carri-er you need an inspection within 15 days. This is very important as claims are not valid after 15 days unless the carrier is notified of damage. Do not accept defective items or items that can be repaired.

We will reimburse the Displayer for glass re-pair, etc. *She* sends the bill to us with a copy of the order. This must be done through the Man-ager.

All damage on a particular shipment must be sent in at the same time.

Send a copy of each Displayer's invoice, inspec-tion report from the carrier or a signed waiver of inspection, along with a copy of the delivery receipt and list of each Displayer and the amount of credit she is to receive. This damage *must be approved by the Displayers' Manager.*

DISTRIBUTOR CHANGE OF SHIPPING AD-DRESS, IMPORTANT!!: All of your distributor freight rates are based on special commodity rates from the Dallas Metroplex to the specific city or point in which you receive your freight. If you plan to move a point outside your present city limits, we must have at least (90) days notice and the name of the new city or point of the planned move. This is extremely important because we have to have the new receiving point added to our present commodity rate. If this is not done, we would have to pay a much higher class rate in order to be able to ship to the new receiving point.

COMMODITY DESCRIPTION ON RE-TURNED MERCHANDISE OR RESHIPMENTS: Authorization must be given by the Communica-tion Center (1149) before any merchandise can be returned or reshipped. On all returned mer-chandise to Home Interiors or any reshipments made by you, please fill in the following de-scription of articles on the bill of lading of your reshipment: Plastic articles N.O.I., Density 6 to 12 lbs. per cu. ft. and O.A.S.O.L. (Glassware released value exceeding $1.50 but not exceed-ing $2.00 per lb. This is very important and will insure the proper rate is charged by the motor carrier. If an improper description is put on the bill of lading we could be charged as much as *four times* the amount of the correct rate.

REACT TIME ON FREIGHT CLAIMS: All freight claims should be processed and returned to Dallas for credit within thirty (30) days of the shipping date from Dallas. This is a very im-portant service function for our Displayers.

This will help expedite credit and will eliminate the possibility of an order being held in Dallas for nonpayment on damaged or short merchan-dise.

You should never allow freight claims to accu-mulate. Accumulated claims cause problems for everyone concerned. We need everyone's help in this area, so please expedite all future freight claims. If you have any exceptions to this policy, please notify us immediately on each exception. This will enable us to notify our Credit Department that there is a delay on the Displayers freight claim credit.

OUTSIDE OF HOME DELIVERIES: It is our suggestion that no orders should be left outside of a home unattended. There have been a num-ber of thefts on this type of deliveries. It is the Distributors' responsibility to deliver all orders inside the home or in a secured garage or build-ing. Even if you have a written request for this type of service, it would be very difficult to prove responsibility in the event of a theft. Dis-tributors must assume full liability for all mer-chandise while in their for your own protection you take the necessary steps to secure your entire operation.

VACATIONS: We ask that you please advise all Managers within your Distributorship to spe-cific dates of your vacation or absence. Also the name and phone number of the person who will be responsible for your Distributorship dur-ing your absence.

LATE FREIGHT: If you anticipate late freight for any reason, we ask that you notify our Communications Department as soon as possi-ble by telephone. You will also need to notify all Managers concerned so that they can make preparations to distribute late freight affidavits. This will aid the Displayers and allow them to avoid credit problems.

HOME OFFICE CONTACTS: There are sever-al departments that are concerned with the dis-tribution of Home Interiors' Freight.

1. *Traffic Department*—This department is re-sponsible for the routing and setting up rates and handling claims. Any contact with the Traffic Department should be handled through the Freight Distribution Coordinator (214/386-1131).

2. *Communication Center*—This department is responsible for lost freight and late freight. They will trace your shipments and handle all shortages. Their hours of operation are 8:00 a.m. to 9:45 a.m., 10:00 a.m. to 11:45 a.m., 12:45 p.m. to 2:45 p.m. and 3:00 p.m. to 5:00 p.m.

3. *Freight Distribution Coordinator*—This de-partment will handle any problems that arise other than late and short freight and will assist in these matters if need be. If there is anything you need to know or wish to ask, the Coordina-tor's office should be able to help (214/386-1131).

ter receiving the merchandise, the decision regarding to whom Guelker was to distribute merchandise was "an arrangement that he had between the displayer and the manager and himself." Home Interiors shipped its merchandise to Guelker in boxes that were addressed to the appropriate displayers. Following receipt of the merchandise, Guelker was generally responsible for finding out how to get to the displayers' homes; however, Guelker's wife, the local unit manager for Home Interiors, sometimes gave Guelker a "D" form. A "D" form was a form that was completed by a displayer, and that provided "a little map as to how to get to" the displayer's home and indicated where in the home Guelker should leave the merchandise, if the displayer was not at home. At the time of the accident, Guelker had received merchandise from Home Interiors via a common carrier and was in the process of delivering the merchandise to a displayer.

■ The test in determining whether a master-servant relationship exists is whether or not the employer has the "right to control" the details of the work. *Newspapers, Inc. v. Love,* 380 S.W.2d 582 (Tex. 1964). In *Newspapers, Inc. v. Love,* the Texas Supreme Court wrote:

> The doctrine which holds the master liable for the torts of his servant committed in the course of his employment is essentially a policy doctrine and except for acts personally directed by the principal, the liability of the master is founded upon the contractual arrangement with the servant, either expressed or implied which vests in him the right to control the details of the work. *Glasgow v. Floors, Inc., of Texas* (1962), 356 S.W.2d 699, no wr. hist.; Philip Mechem, "Agency" §§ 413–416. Certainly if the right of control of details has a contractual basis, the circumstance that no actual control was exercised will not absolve the master of liability. *Ballard & Ballard Company v. Lee's Administrator* (1909), 131 Ky. 412, 115 S.W. 732; Phillip Mechem "Agency" § 415. Conversely, an occasional assertion of control should not de-

stroy a settled relationship agreed to by the parties.

*Newspapers, Inc. v. Love,* 380 S.W.2d at 589.

The contractual arrangement may be oral or written. *Eagle Trucking Co. v. Texas Bitulithic Co.,* 590 S.W.2d 200 (Tex.Civ. App.—Tyler 1979), aff'd. in part, rɜv'd. in part, 612 S.W.2d 503 (Tex.1981).

In *Smith Brothers, Inc. v. O'Bryan,* 127 Tex. 439, 94 S.W.2d 145 (Comm.App.1936, opinion adopted), the Texas Commission of Appeals wrote:

> Our decisions have for a long time emphasized the necessity of control over the details of the work to be done and the means by which it is done in order to create the relationship of master and servant. For instance, in many cases the courts have adopted the language quoted in *Cunningham v. International Railroad Co.,* 51 Tex. 503, 510, 32 Am.Rep. 632, from Shearman and Refield on Negligence, to wit: "He is deemed the 'master' who has the supreme choice, control, and direction of the servant, and whose will the servant represents not merely in the ultimate result of the work, but in all its details." (Italics ours.)

> In *Shannon v. Western Indemnity Co.* (Tex.Com.App.) 257 S.W. 522, 523, the following quotation from Street on Personal Injuries was quoted with approval: "No better test can be applied than to say that the relation of master and servant exists where the master retains or exercises the power of control in directing, not merely the end sought to be accomplished by the employment of another, but as well as the means and details of its accomplishment; 'not only what shall be done, but how it shall be done.'" (Italics ours.)

*Smith Brothers, Inc. v. O'Bryan,* 94 S.W.2d at 148.

■ The term "independent contractor" has been defined as follows: "A contractor is any person who, in the pursuit of an independent business, undertakes to do a

specific piece of work for other persons, using his own means and methods, without submitting himself to their control in respect to all its details." *Pitchfork Land & Cattle Co. v. King,* 162 Tex. 331, 346 S.W.2d 598 (1961). Recognized tests for determining when a person is acting in the capacity of an independent contractor are: (1) the independent nature of his business; (2) his obligation to furnish necessary tools, supplies and materials to perform the job; (3) his right to control the progress of the work except as to the final results; (4) the time for which he is employed; and, (5) the method of payment, whether by the time or by the job. *Pitchfork Land & Cattle Co. v. King,* 346 S.W.2d 598 (Tex.1961); *See William Sommerville & Son, Inc. v. Carter,* 571 S.W.2d 953 (Tex.Civ.App.—Tyler 1978) aff'd., 584 S.W.2d 274 (Tex.1979).

It is apparent from the record that, in his work as a freight distributor, Guelker had primarily two functions: (1) receiving merchandise from Home Interiors via a common carrier and (2) delivering merchandise to displayer's homes. Even though the record indicates that Home Interiors may not have maintained any day-to-day supervisory control over Guelker's performance of his work, Home Interiors did prescribe detailed procedures and policies in its Freight Instructions for Distributors by which Home Interiors contracted for the right to control and governed Guelker's performance of a substantial portion of the details of his work, especially his receiving merchandise. These detailed instructions left Guelker little or no discretion in how to receive such merchandise or regarding what to do upon receipt thereof.

In addition, the evidence showed that Mrs. Guelker, the local unit manager for Home Interiors, frequently gave Guelker a "D" form which "routed Guelker deliveries to displayers' homes. Even though the maps so that Guelker could get to the displayers' houses" and which "would indicate how the displayer wanted deliveries to be made." While we recognize that this exercise of control over Guelker's activities would not alone be sufficient to place Guelker in the status of an employee, it was additional evidence for the jury to consider in determining that Guelker was an employee of Home Interiors.

■ After reviewing the entire record, we hold that there was sufficient evidence, which demonstrated that Home Interiors had contracted for and/or maintained the right to control the details of Guelker's work and upon which the jury could have based its finding that Guelker was Home Interiors' "employee." *See Newspapers, Inc. v. Love,* 397 S.W.2d 469 (Tex.Civ.App.—Austin 1965), writ ref'd. n.r.e., 405 S.W.2d 300 (Tex.1966); *See also Newspapers, Inc. v. Love,* 380 S.W.2d 582 (Tex. 1964); *Pitchfork Land & Cattle Co. v. King,* 162 Tex. 331, 346 S.W.2d 598 (1961); *Carter Publications, Inc. v. Davis,* 68 S.W.2d 640 (Tex.Civ.App.—Waco 1934, writ ref'd.); *Compare Dave Lehr, Inc. v. Brown,* 127 Tex. 236, 91 S.W.2d 693 (Comm.App.1936, opinion adopted); *Eagle Trucking Co. v. Texas Bitulithic Co.,* 590 S.W.2d 200 (Tex.Civ.App.—Tyler 1979), aff'd. in part, rev'd. in part, 612 S.W.2d 503 (Tex.1981). Appellant's first and second points of error are overruled.

■ In its third point of error, appellant alleges that there was no evidence to support the jury's findings regarding "loss of earnings in the past." The jury found that appellee suffered a "loss of earnings in the past" in the amount of $13,936.00. Although the damage issue was submitted in terms of "loss of earnings in the past," the proper measure of damages for such issue is not "loss of earnings in the past" but rather is "diminished earning capacity." *Dallas Railway & Terminal Company v. Guthrie,* 146 Tex. 585, 210 S.W.2d 550 (1948); *T.J. Allen Distributing Company v. Leatherwood,* 648 S.W.2d 773 (Tex. App.Beaumont 1983, writ ref'd. n.r.e.). However, appellant made no objections to the submission of the improper measure of damages and does not now contend that this element of damage should have been submitted in terms of "diminished earning capacity"; therefore, appellant has waived any such complaint on appeal. *T.J. Allen*

*Distributing Company v. Leatherwood,* 648 S.W.2d at 774; *Bailey v. Merrill,* 582 S.W.2d 489 (Tex.Civ.App.—Beaumont 1979, writ ref'd. n.r.e.). As a result of appellee's submission of the damage issue in terms of "loss of earnings in the past," his burden of proof was greater than his burden in proving "diminished earning capacity." *T.J. Allen, Distributing Company v. Leatherwood,* 648 S.W.2d at 775; *Bailey v. Merrill,* 582 S.W.2d at 491; *Ryan v. Hardin,* 495 S.W.2d 345 (Tex.Civ.App.—Austin 1973, no writ).

At trial, the evidence presented regarding appellee's work history was the following testimony given by appellee's father: Before he was injured, appellee worked with his father as a carpenter's assistant "for about two years"; and, afterwards, appellee worked for a relative "bringing cars down here on a trailer." Pursuant to hearsay objections, the trial court either excluded or instructed the jury to disregard appellee's father's testimony regarding appellee's wage rates for these two jobs. No other evidence was presented concerning appellee's work history. At the conclusion of trial, a life expectancy table promulgated by the U.S. National Center for Health Sciences, Vital Statistics of the United States, was admitted into evidence, and the parties stipulated that the federal minimum wage rate was $3.35 per hour.

■ As noted by appellee in his brief, this jury award for "loss of earnings in the past" is the equivalent of $3.35/hour (the stipulated federal minimum wage rate) times 8 hours/day times 5 days/week times 102 weeks (the approximate period of time between the date of the accident and the date of the trial). If appellee only had to prove "diminished earning capacity" in the past, we conceivably would have held that the evidence was sufficient; however, having submitted the damage issue in terms of "loss of earnings in the past," appellee had, in effect, the greater burden of proving his entitlement for reimbursement for lost wages in the past. Even though the parties stipulated that the federal minimum wage was $3.35 per hour, there is no evi-

dence in the record to indicate appellee's actual wages or actual hours worked for each of his two jobs as a carpenter's assistant and as a vehicle transport driver. In addition, the scant evidence regarding appellee's work history prior to the accident does not indicate his employability or, if he had been employed, his employment stability during the period of time between the date of accident and the date of trial.

After reviewing the entire record, we hold that, in light of appellee's greater burden in proving "loss of earnings in the past," the evidence was insufficient to support the jury's finding of damages in the amount of $13,936.00 for "loss of earnings in the past." Appellant's third point of error is sustained.

Appellant's fourth point of error alleges that there is no evidence or insufficient evidence to support the jury's finding regarding appellee's "loss of future earning capacity." The rule for determining the amount of proof necessary for establishing loss of earning capacity was stated by the Supreme Court in *Bonney v. San Antonio Transit Company,* 160 Tex. 11, 325 S.W.2d 117 (1959), as follows:

> [W]here a plaintiff seeks damages for impairment of earning capacity, he must prove the amount of such damages with the degree of certainty to which it is susceptible. *Dallas Consolidated Electric Street Railway Co. v. Motwiller,* 101 Tex. 515, 109 S.W. 918; *McIver v. Gloria,* 140 Tex. 566, 169 S.W.2d 710; *Southwestern Freight Lines v. McConnell,* Tex.Civ.App., 254 S.W.2d 422, wr. er. ref. This rule requires that a plaintiff introduce evidence from which a jury may reasonably measure in monetary terms his earning capacity prior to injury, unless some reason appears for his failure to do so. The reason for this rule is that although the amount of the injuries resulting from impairment of a plaintiff's earning capacity must be largely left to the sound judgment and discretion of the jury, nevertheless the jury should not be left to mere conjecture where

facts appear to be available upon which the jury could base an intelligent answer. *Bonney v. San Antonio Transit Company,* 325 S.W.2d at 121.

■ Where a plaintiff has a limited work history, the jury must determine the value of the plaintiff's lost earning capacity based upon their common knowledge and their sense of justice. *Roth v. Law,* 579 S.W.2d 949 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd. n.r.e.); *English v. Hegi,* 337 S.W.2d 860 (Tex.Civ.App.—Amarillo, 1960 no writ). Furthermore, in making its determination, the jury is entitled to consider the constant decreases in the value of the dollar and the commensurate increases in salaries. *Armellini Express Lines of Florida, Inc. v. Ansley,* 605 S.W.2d 297 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd. n.r.e.); *Roberts v. Tatum,* 575 S.W.2d 138 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd. n.r.e.); *Southern Pacific Transportation Company v. Peralez,* 546 S.W.2d 88 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd. n.r.e.).

As previously noted, the only testimony concerning appellee's work history was that given by appellee's father. Also, as noted above, a life expectancy table was admitted into evidence, and the parties stipulated that the federal minimum wage rate was $3.35 per hour.

■ The evidence concerning appellee's physical condition showed that, as a result of the accident, appellee sustained serious personal injuries and would not be physically suited for any heavy manual labor work and that it might be possible, but "not probable," that appellee would require a leg amputation. Evidence was also presented which indicated (1) that appellee sustained frontal brain lobe damage and, consequently, had suffered and would continue to suffer from a chronic organic brain syndrome and (2) that, as a result of the chronic organic brain syndrome, appellee had been and would continue to be mentally handicapped. Also, there was evidence presented to indicate that appellee's prognosis for recovery from the chronic organic brain syndrome was "very poor" and that

appellee would need continuous supervision.

Based upon the above standard for loss of future earning capacity, we hold that there is sufficient evidence upon which the jury could have based its award because, in this case, the amount of damages have been established with a degree to which they were susceptible. Appellant's fourth point of error is overruled.

■ In its fifth point of error, appellant contends that the trial court erred in failing to include in the definitions for "employee" and/or "independent contractor" in the Court's Charge the following additional instruction: "A person is not acting as an employee if he is acting as an independent contractor." Appellant claims that the terms "employee" and "independent contractor" are mutually exclusive terms and that, because the additional instruction was omitted, the jury could have been misled into believing that Guelker could have been classified as both an employee and an independent contractor.

In the Court's Charge, the trial court submitted disjunctively an issue, inquiring whether "Guelker was acting as an employee of Home Interiors & Gifts, Inc., *or* was he acting as an independent contractor." The issue was followed by the definitions of "employee" and "independent contractor" that are prescribed in Texas Pattern Jury Charges §§ 4.03–4.05 (1969).

Since the issue was submitted in the disjunctive form together with the prescribed definitions of "employee" and "independent contractor," we hold that the issue was "fairly submitted" and did not mislead the jury into believing that Guelker "could have been legally classified as both" an employee and independent contractor. *See* TEX.R.CIV.P. 279. Appellant's fifth point of error is overruled.

In its sixth point of error, appellant asserts that the trial court erred in failing to take the necessary steps to reform its initial judgment. The record reflects that the trial court initially signed its "Final Judgment." Appellant subsequently filed its

"First Motion to Reform Judgment," requesting that the trial court reform its judgment to provide appellant indemnification from Guelker. The trial court granted appellant's motion to reform judgment and entered its "Reformed Final Judgment."

Appellant argues that, since there is nothing in the record to show that the trial court expressly vacated the first judgment ("Final Judgment"), the second judgment ("Reformed Final Judgment") is a nullity.

A second judgment need not contain language which specifically vacates an earlier judgment; it is only necessary for the record to indicate that the second judgment vacates and replaces the former judgment. *Allen v. Allen,* 646 S.W.2d 495 (Tex.App.—Houston [1st Dist.] 1982, no writ). In this case, the record reflects through a docket entry ("3/14/84 Motion to reform Jmt. granted.") and the second judgment's heading ("Reformed Final Judgment"), both of which are reflected in the record, that the trial court intended to vacate and reform its first judgment ("Final Judgment") and to have its second judgment ("Reformed Final Judgment") replace or supersede the first judgment. Accordingly, we hold that the action taken by the trial court to reform its first judgment was sufficient. *See Allen v. Allen,* 646 S.W.2d at 496. Appellant's sixth point of error is overruled.

The second judgment ("Reformed Final Judgment") of the trial court is REFORMED, deleting the award of $13,936.00 for "loss of earnings in the past" against appellant Home Interiors only, and, as REFORMED, is AFFIRMED. Costs of this appeal are adjudged against appellant.