Johnnie Rex **JOHNSON**,
Plaintiff-Appellee,

v.

**MICHELIN TIRE CORPORATION**,
Defendant-Appellant.

No. 86–1181.

United States Court of Appeals,
Fifth Circuit.

March 11, 1987.

Jack Pew, Jr., Dallas, Tex., Scott, Hulse, Marshall, Feuille, Finger & Thurmond, James L. Gallagher, El Paso, Tex., for defendant-appellant.

Charles A. Deason, Jr., El Paso, Tex., for plaintiff-appellee.

Before WILLIAMS, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Michelin appeals the judgment in favor of Johnnie Rex Johnson for damages resulting from an accident allegedly caused by a defective tire. The jury found that a manufacturing defect in the tire caused the accident and awarded $824,676 to Johnson. On appeal Michelin contends that neither the jury's findings on liability nor its award of damages is supported by the evidence.

I

A.

We first look to Johnson's background of previous injuries and previous earnings. From 1970 to 1978, Johnson lived in Houston and worked in the construction industry. In 1978 he moved to El Paso where he started Gulf Seafood Company, which sold seafood to restaurants in the area. In that business, Johnson drove to the Texas coast each day and brought seafood back to El Paso. Except for his own unsupported statement, Johnson offered no evidence that Gulf Seafood was a thriving business; although Johnson testified that the company made money, he was unable to say how much because, he said, his wife handled the financial part of the business. There was evidence, however, that several of the company's trucks were repossessed for nonpayment of loans.

Sometime in 1982, Johnson sold Gulf Seafood and moved to Cloudcroft, New Mexico, where his wife had a beauty salon which, according to Johnson, made over $100,000 per year. In Cloudcroft, Johnson became acquainted with Jimmy Herrell, a real estate broker. Johnson, who was not employed then, was interested in selling real estate with Herrell, and to that end enrolled in a real estate course in Las Cruces.

In May 1983, when Johnson was returning from a class in Las Cruces, he crashed his car into a telephone pole while driving at approximately 100 miles per hour. The crash threw Johnson from the car for over 150 feet. He was taken to a hospital where he was treated, and released about two weeks later. Blood tests performed at the hospital revealed that Johnson was intoxicated at the time of the accident. Three weeks after his discharge from the hospital, Johnson was readmitted following a fall in the bathtub in which he had broken a bone in his neck. According to a summary of the testimony of Dr. Bruce San Filippo, a neurosurgeon and Johnson's treating physician after the 1983 accidents, Johnson suffered a skull fracture with significant brain damage, and as a result was confused and disoriented. Johnson also suffered from facial paralysis and difficulties with movement on the left side of his body, and had a short attention span. Dr. San Filippo further testified that problems resulting from the accidents continued for more than a year and were unlikely to improve substantially.

At trial, Herrell testified concerning Johnson's condition after the 1983 accidents. In the summer of 1983, Johnson worked for Herrell by handing out brochures and answering visitors' questions at Herrell's real estate development in Cloudcroft. For this work Herrell gave Johnson a check for $500. This is the only job Johnson held in Cloudcroft after the 1983 accidents. At that time he still had difficulty with his speech and with movement, especially in his left hand; according to Herrell, however, Johnson was capable of certain job functions. After his job with Herrell ended in September 1983, Johnson moved back to El Paso. There he sought employment with stock brokerage houses and life insurance companies. He was never offered such employment, however, as he apparently could not pass the qualifying examinations necessary for those positions. He did obtain work with Sir Speedy Printing in El Paso, but left that job after about one week because of his poor health. In August 1984, Herrell again saw Johnson and stated that he "looked real good," had gained weight, and was making progress. He did, however, continue to walk with a limp.

### B.

With respect to the accident that is the subject of this lawsuit, on September 12, 1984, Johnson was driving on a four-lane highway in El Paso when his car, equipped with four-year-old Michelin tires, crossed two lanes and hit the guard rail. Johnson has no memory of the accident. Lisa Uranga was traveling at about 50–55 mph behind Johnson and saw his vehicle swerve sharply to the right. At trial, Uranga testified that she did not hear any loud noise or see any debris on the highway that Johnson's car could have hit. She stated that she did not notice dust or an explosion at the right rear tire, but that she was not looking at that area of the car.

Johnson was unconscious when Uranga arrived at the car. He was still unconscious when emergency medical personnel arrived and he did not respond to verbal or painful stimuli. Johnson later regained consciousness but was not coherent. He was taken to a hospital where tests revealed a skull fracture, and multiple abrasions and lacerations. By the following day he was oriented and lucid and able to move around on his own.

At trial, Johnson offered the testimony of Dr. Arthur C. Bieganowski, a physician who had completed residencies in both neurology and psychiatry, and who was recommended to Johnson by a chiropractor he had been seeing after the 1984 accident. Bieganowski testified that Johnson complained of not being able to "get his life together"; he had lost his sense of smell and had a constantly stuffy nose; and the paralysis on the left side of his body caused some pain and left him with poor balance. He also suffered from vertigo, memory lapses, poor eyesight and impaired concentration. Bieganowski referred Johnson for psychological, neurological and vocational testing. From these tests, Bieganowski concluded that Johnson had suffered some brain damage and was not then employable. Based on his review of Johnson's

medical records, Bieganowski stated that at the time of the 1984 accident, Johnson was recovering from the 1983 accidents. Although Johnson still suffered from the effects of the 1983 accidents, the 1984 accident had impaired his ability to make decisions and made him emotionally labile. According to Bieganowski, Johnson is now unable to live alone and take care of himself and, because more than a year has passed since the 1984 accident, Johnson's condition is not likely to improve.

Bieganowski also testified with regard to damages. He reviewed the medical bills relating to the 1984 accident, and stated that the amount, $4,676.40, was reasonable. Bieganowski testified that the cost of the custodial care that Johnson would need would be $8,000 to $10,000 a year and that future psychiatric care would cost from $1,000 to $2,000 a year.

## C.

Several witnesses testified at trial regarding the cause of the accident.[1] Before we recount their testimony, we note that the right rear tire had three openings: one that was disregarded by the parties as unrelated to the cause of the accident; a second, V-shaped opening, which we will refer to as "the cut"; and the third opening, which we will refer to as "the tear."

The police officer who investigated the accident, Ricardo Saucedo, testified that he located two skid marks at the scene. The marks were four feet apart in the lane of the highway in which Johnson was originally driving, and approximately nine feet apart at the guard rail. The left mark was an unbroken smudge; the right skid mark, however, was striped or chevron-shaped. Saucedo stated that his training and experience in accident investigation led him to the conclusion that the two marks were made by the front left and right rear tires respectively, and that the right rear tire, as evidenced by the distinctive striped marks, had blown out. He also testified that he saw no debris in the highway and that the right rear tire of the car was flat.

Lawrence R. Sperberg, the plaintiff's expert, testified that the marks were made by the two rear tires,[2] the right rear tire being flat at the time. He stated that the right rear tire had no "run flat" damage, characteristic of a tire that has rolled while flat, because the car traveled only fifty to sixty feet before stopping at the guard rail. It was his opinion that the right rear tire blew out at the tear, shifting the car's weight from right to left and causing the veer to the right.[3] According to Sperberg, the blowout was the result of a separation of the tire's polyester cords from the rubber of the tire, caused by the presence of excess oxidation. He testified that tires contain antioxidants to prevent the accumulation of oxygen in the tire, because oxygen causes the tire to separate. His testing of parts of the tire on an electron microscope revealed excessively high levels of oxygen that could have been caused either by a defective design that included too little antioxidant, or by defective manufacture that allowed the tire to be contaminated with oxygen during the manufacturing process. He stated that the cut occurred after the tire had deflated and was not a cause of the accident.

Emanuel Zambalas, a product analyst engineer employed by Michelin, testified for

---

1. It was, of course, Johnson's contention that the accident was caused by a blowout. Michelin does not fully reveal its theory of what caused the automobile to leave the highway and hit the guard rail, although there was evidence that Johnson was subject to blackouts. Michelin's defense and arguments on appeal are simply that there was no blowout and that the tire went flat as a result of the accident after impact with the guard rail.

2. Sperberg's testimony differs from that of Officer Saucedo who stated that the marks were made by the right rear and left front tires.

Sperberg's testimony also conflicts with that of Mr. Basham who testified that the marks were made by the left rear and left front tires. It is made even clearer to us that when experts' opinions vary this much on crucial occurrences, the jury has the liberty to reject or to accept in whole or in part the "expert" testimony, and the jury's conclusion should not be tampered with on appeal.

3. Sperberg stated that a blowout can make a car go straight, go right, go left, or anywhere in between.

Michelin and as an adverse witness for Johnson. He stated that the cut could have occurred only while the tire was inflated and was caused by the tire hitting debris that was caused by the impact of hitting the guard rail. His opinion was based on his examination of the tire which showed cut and frayed cords at the cut area rather than just frayed cords which would be present at a blowout. Zambalas further stated that a single tear does not evidence a blowout; a blowout occurs when a bubble of air bursts inside the rubber of the tire and leaves multiple tears rather than a single tear. He also stated that a separation such as that suggested by Sperberg would occur in the early life of a tire.

Donald J. Basham, an accident reconstructionist, also testified for Michelin. He discussed the effects of kinetic energy on a vehicle making a turn, and concluded that the skid marks were made by the two left tires. He conjectured that the tire in question went flat only after the accident, as a result of hitting the guard rail. According to Basham, the chevron-stripe marks indicated an inflated tire; a deflated tire will leave gouge marks on the highway and will also suffer "run flat" damage, which was not present but should have been if the tire had crossed two lanes of a highway while flat.

Michelin also produced Robert Villagrana, a failure analyst for manufacturers of various products. He testified that all tires do and must contain oxygen; whether such oxygen is detrimental, however, depends on its molecular makeup. Although Sperberg's electron-microscope tests could measure the presence of oxygen, they could not, according to Villagrana, identify the molecular makeup of that oxygen that would detrimentally affect the tire. He did, however, test new Michelin tires on an electron microscope and found low levels of oxygen, but reiterated that, from the type of tests performed by Sperberg and himself, no conclusion could be drawn as to whether the oxygen was detrimental. Villagrana further contended that Sperberg's specimens were contaminated and the results of Sperberg's tests were therefore inaccurate. Villagrana's specimens, which were from new tires and not the tire in question, were also contaminated, however, because the technique necessary to purify the rubber in a tire is not available.

II

The jury found, in special interrogatories, that the tire was not defectively designed, but that it was defectively manufactured by Michelin, and that the defect was a producing cause of the accident. The jury also found that Johnson was not negligent. The jury awarded $14,676 for past necessary medical and hospital care and medication; $25,000 for past mental anguish, physical pain, loss of enjoyment of life and physical impairment; $60,000 for future mental anguish, physical pain, loss of enjoyment of life and physical impairment; $15,000 for past loss of earnings; $280,000 for future loss of earning capacity; and $430,000 for future necessary medical and hospital care and medication. The jury did not award damages for past or future disfigurement. Following the verdict, Michelin moved for judgment notwithstanding the verdict on the grounds that the evidence did not support the jury's finding of liability or the award of damages for past medical care, future medical care, past loss of earnings, future loss of earning capacity and future pain and suffering. Michelin also moved for a new trial on the same grounds, and on the ground that the district court had erred in allowing admission of testimony regarding a congressional study of the tire industry. The district court denied both motions. This appeal followed.

III

Michelin contends that Johnson failed to produce sufficient credible evidence to support the jury's verdict finding Michelin liable. Our consideration of a challenge to the sufficiency of the evidence is governed by the familiar test of *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969):

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evi-

dence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

Furthermore, *Boeing* makes it clear that it is the task of the jury and not this court to "weigh conflicting evidence and inferences and determine the credibility of witnesses." *Id.* at 375.

Under Texas law, which is applicable in this diversity case:

To recover for a manufacturing defect under strict liability, the plaintiff must show [1] a manufacturing flaw which renders the product unreasonably dangerous; [2] that the defect existed at the time the product left the seller, and [3] that the defect was the producing cause of the plaintiff's injuries. *Restatement (Second) of Torts*, sec. 402A (1965).

*Fitzgerald Marine Sales v. Le Unes*, 659 S.W.2d 917, 918 (Tex.Ct.App.1983). Therefore, according to its verdict, the jury found that when the tire left Michelin it was contaminated with excess oxygen, rendering it unreasonably dangerous, and that the defect resulted in a blowout which was the producing cause of the accident.

■ First, Michelin argues that Johnson failed to establish that a blowout occurred. Such a failure of proof would be fatal to Johnson's case because he proceeds on the theory that the accident was caused by the blowout of a tire, resulting from a manufacturing defect. Proof of a blowout is therefore a critical element of Johnson's claim, and attacking this proof is central to Michelin's appeal. According to Michelin, "undisputed" evidence established that a cut and not a blowout deflated the tire. Certainly Michelin's expert, Zambalas, testified that because of the strength of the rubber in the tire and the force necessary to make the cut, the cut could only have been made when the tire was inflated. This testimony was disputed in several ways, however. First, Sperberg, Johnson's expert, was aware that a cut had been made on the tire and yet did not withdraw his opinion that a blowout caused the tire to deflate since his testimony was based on the tear in the tire, not the cut. When questioned on cross-examination regarding the cut, Sperberg stated that it must have occurred after the blowout. Second, Zambalas testified that, in his opinion, the tire was cut by debris from the crash. Both witnesses at the scene of the accident, however, testified that they did not see debris in the highway after the accident.

With respect to the tear, Zambalas testified that it was not characteristic of an opening caused by a separation. This testimony was also disputed, however, by Sperberg's opinion that the opening did indicate that it was caused by a separation.

■ Additionally, Michelin contends that Sperberg's theory that a blowout occurred is not credible in view of the testimony of Basham, its accident reconstructionist, who criticized the diagrams and measurements made by Officer Saucedo at the accident scene, upon which Sperberg relied. According to Basham, Saucedo's diagram could not reflect the location of the skid marks. Basham altered the measurements made by Saucedo to conform to his opinion of the proper alignment of the skid marks and then based his theory of causation on his diagram. Basham's testimony was only his opinion, additional evidence to be weighed by the jury. That the jury apparently chose to believe Saucedo's measurements and therefore Sperberg's testimony, based on those measurements, is not unreasonable. We note that the jury could have been influenced by Saucedo's neutral position in the lawsuit and by the fact that his diagram, which was approved by a superior officer, was made on the basis of his first-hand view of the site soon after the acci-

dent. A reasonable jury was therefore entitled to believe that the tire blew out.[4]

■ Second, Michelin argues that Johnson failed to establish that deflation of the tire, even if the result of a blowout, was caused by a manufacturing flaw. Under Texas law, a manufacturing defect can be established by circumstantial evidence. *Turner v. General Motors Corp.*, 584 S.W.2d 844, 848 (Tex.1979). Here Sperberg expressed his opinion that excess oxygen or insufficient antioxidant was introduced into the tire during the manufacturing process. He explained that the effect of excess oxygen is to separate the polyester cords from the rubber, causing a separation that, in this case led to the blowout. His testimony that a malfunction occurred, along with the direct evidence of the tire itself, is sufficient evidence that a manufacturing defect existed when the tire left Michelin. *See General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 350 (Tex.1977).

Michelin contends, however, that Sperberg's opinion that a manufacturing defect led to a separation that caused the blowout is not entitled to any weight as its credibility was undermined by the testimony of Michelin's witnesses. In support of its argument, Michelin relies on the testimony of two of its three expert witnesses. We have already discussed Zambalas' testimony and concluded that a jury was entitled to reject his opinion that the tear was not characteristic of a separation or blowout in favor of testimony favorable to Johnson.

Additionally, Villagrana testified that Sperberg's electron microscope tests are not reliable. Again, this testimony does not rise to the level of an absolute truth that must be accepted by the jury. Sperberg testified that as a result of his tests, he determined that the tire in question had excessive levels of oxygen that made the tire dangerously defective. Villagrana, although questioning Sperberg's testing methods, acknowledged that the electron

microscope could accurately test the levels of oxygen in an uncontaminated tire specimen. It is true that Villagrana testified, apparently without dispute, that the electron microscope would not detect the detrimental effect of oxygen on the tire. Villagrana, however, never tested the tire in question and thus, although Michelin attempted an explanation as to why the tire in question contained high levels of oxygen, the fact that it contained high levels of oxygen is undisputed. The jury was free to reject all or part of Villagrana's testimony. In this case, the jury could have rejected Villagrana's criticism of Sperberg's tests and accepted the testimony that Villagrana's electron microscope testing revealed low levels of oxygen in new Michelin tires.

We hold that this evidence on the record before us is sufficient to support the jury's finding of liability for a manufacturing defect.

## IV

■ Michelin finally contends that four of the elements [5] of damages awarded by the jury are excessive and that the district court erred in refusing to grant a remittitur, or, in the alternative a new trial on the issue of damages. A strong showing of excessiveness is required to warrant a remittitur; only "when a jury's award exceeds the bounds of reasonable recovery" will we grant a remittitur or order the district court to do so. *Dixon v. International Harvester Co.*, 754 F.2d 573, 590 (5th Cir.1985). The district court's denial of a motion for a new trial is reviewable only for abuse of discretion. *See id.* at 586.

### A.

■ The jury returned a verdict of damages for past medical expenses in the amount of $14,676.00. The undisputed evidence, however, established that past medi-

---

**4.** As Michelin contends, Johnson did not rebut or disprove all of the other possible reasons for the tire's deflation. This, however, Johnson was not required to do. *Darryl v. Ford Motor Co.*, 440 S.W.2d 630 (Tex.1969).

**5.** The jury's awards for past and future pain and suffering are not appealed.

cal expenses were in the amount of $4,676.40. Because the proof was so clear, we hold that the jury's award "exceeds the bounds of reasonable recovery." *Dixon,* 754 F.2d at 573. Therefore we order a remittitur in the amount of $9,999.60.

### B.

According to its verdict, the jury determined that Johnson was entitled to $15,000 in damages for "such loss of earnings, if any, that he has sustained since September 12, 1984 until the date of this trial." The jury was instructed, however, not on actual loss of earnings, but rather on past lost earning *capacity.*[6] The distinction is significant because under Texas law, the burden of proof for the two types of damages is different. *See Bailey v. Merrill,* 582 S.W.2d 489, 491 (Tex.Civ.App.—Beaumont 1979, writ ref'd n.r.e.); *Ryan v. Hardin,* 495 S.W.2d 345, 349–50 (Tex.Civ.App.—Austin 1973, no writ). We need not determine which measure of damages was used, however, because Johnson meets neither burden.

■ In *Home Interiors & Gifts, Inc. v. Veliz,* 695 S.W.2d 35 (Tex.App.1985), the jury returned a verdict for damages for "loss of earnings in the past." The plaintiff had presented proof that prior to his accident he worked as a carpenter's assistant and as a vehicle transport driver, but he did not show the hours he worked or the wages he was paid on these jobs. On appeal, the jury verdict was reversed because the plaintiff had failed to meet his "burden of proving his entitlement for reimbursement for lost wages in the past." *Id.* at 42. The court held that the evidence was insufficient to support the verdict because the plaintiff did not establish his hours and wages prior to the accident; additionally, "the scant evidence regarding [the plaintiff's] work history prior to the accident does not indicate his employability or, if he had been employed, his employment stability during the period of time

between the date of accident and the date of trial." *Id.*

Applying the reasoning of *Home Interiors,* we must reverse any damage award for past lost earnings. The evidence shows that Johnson held two jobs after the 1983 accidents; he handed out brochures at a real estate development, for which he was paid $500, and he worked for approximately one week at Sir Speedy Printing. He attempted to work as a stock broker or insurance salesperson, but apparently was not offered employment because he was unable to pass the preliminary examinations. As in *Home Interiors,* the plaintiff here has not met his burden of establishing any basis for determining how much, if any, he lost in earnings between the accident and trial. Although we know that Johnson was paid $500 for his work for Herrell prior to the 1984 accident, we do not know how many hours he worked although that amount appears to have been his total salary for several months' work. Additionally, his "scant work history," particularly his inability to maintain his job at Sir Speedy, indicates that he was not employable before the 1984 accident. A damages award for past lost earnings should represent a measurement of what a person would have earned during a given time period based on what he has earned in the past. Here Johnson has failed to adduce evidence that he would have earned anything had he not been injured in the 1984 accident. For these reasons, a verdict for lost past earnings is not supported by the record.

■ Michelin also contends that Johnson failed to introduce the proof required for recovery of damages for loss of earning capacity. In *Bonney v. San Antonio Transit Co.,* 160 Tex. 11, 325 S.W.2d 117 (1959), the plaintiff proved that he had owned a watch-repair business before his accident. After the accident, he could no longer repair watches. He then sold his business and obtained a job as assistant

---

**6.** In instructing the jury, the district court stated: "When determining damages, if any, you must consider only these elements ... 4. Past and future lost earning capacity." On special interrogatories, however, the jury was asked to determine "such loss of earnings, if any, that [Johnson] has sustained since September 12, 1984 until the date of this trial."

manager of a jewelry store, for which he received a salary of $75 a week. Based on this evidence, the jury awarded damages for impairment of earning capacity before trial and in the future. On appeal, the Texas Supreme Court stated:

> The rule in this jurisdiction is that where a plaintiff seeks damages for impairment of earning capacity, he must prove the amount of such damages with the degree of certainty to which it is susceptible.... This rule requires that a plaintiff introduce evidence from which a jury may reasonably measure in monetary terms his earning capacity prior to injury, unless some reason appears for his failure to do so. The reason for this rule is that although the amount of damages resulting from impairment of a plaintiff's earning capacity must be left largely to the sound judgment and discretion of the jury, nevertheless the jury should not be left to mere conjecture where facts appear to be available upon which the jury could base an intelligent answer.

*Id.*, 325 S.W.2d at 121.

The court reversed the judgment because Bonney had not produced any evidence of his earnings before the accident or any justification for his failure to do so. *Id.* at 121. The facts before us are distinguishable from *Bonney* in the sense that Johnson did produce some evidence of his work history and earnings immediately prior to the accident. From this evidence, however, we can only conclude that Johnson had no earning capacity at the time of the accident. He was unable to maintain his job at Sir Speedy because of his health and his attempts to obtain other employment were unsuccessful. The only job he held for any period of time was handing out brochures for which he was paid a lump sum of $500.

■ Johnson apparently contends, however, that he is excused under *Bonney* from offering additional proof of his prior earning capacity, and that the jury might have found that had the 1984 accident not occurred, he would have recovered from the 1983 accidents and been able to reestablish an earning capacity. The evidence precludes such a finding, however. First, based on the undisputed medical evidence, the jury could only have found that Johnson's condition as of September 12, 1984, was permanent. Both Drs. San Filippo and Bieganowski testified that any impairment lasting more than one year after the 1983 accidents was not likely to improve. Certainly the 1984 accident worsened his condition, but there is no evidence that his condition would have improved to the point of restoring his earning capacity if he had not been involved in the 1984 accident. Any award of damages for diminished earning capacity based on Johnson's earning ability before the 1983 accidents, therefore, is not supported by the record. Second, even if the jury's verdict could have been based on Johnson's condition before the 1983 accidents, the record contains insufficient evidence of his earning capacity at that time to support an award. All we know of Johnson's pre–1983 work history is that he had several jobs in the construction industry, that he had owned a seafood business, and that he was attending classes to obtain a real estate license. Johnson's self-serving general statements that the seafood business was profitable are undermined by his admission that the company's trucks were repossessed. Additionally, Johnson was apparently unemployed during the year between the time he sold the seafood company and had the 1983 accidents.

For these reasons, we reverse and render the jury's verdict for lost earnings or lost earning capacity in the past.

## C.

■ Michelin also contends that the jury's verdict for future lost earning capacity is not supported by the record. Because the law for loss of earning capacity in the future is the same as for that in the past, we reverse this award for the reasons stated in the preceding section, that is, Johnson failed to adduce evidence that he had any earning capacity at the time the 1984 accident, the subject of this lawsuit, occurred.

### D.

Michelin asserts that the record does not support the jury award of $430,000 for future medical expenses. In Texas, the award of future medical expenses is not an element of damages that must be supported with precise evidence, since it is a matter upon which the jury may make its award based upon the nature of the injuries, the medical care rendered before the trial, and the condition of the injured party. *City of Houston v. Moore*, 389 S.W.2d 545, 550 (Tex.Civ.App.—Houston 1985, writ ref'd n.r.e.). The parties agree that the only evidence of future medical expenses came from Dr. Bieganowski who estimated that custodial care for Johnson would cost $8,000 to $10,000 a year and psychiatric care would cost $1,000 to $2,000 a year. No evidence of Johnson's life expectancy or formulae for discounting an award of future damages to present value was offered. The jury was instructed, however, that as a general matter it could discount lump sum awards.[7]

The undisputed evidence therefore establishes that future medical care would cost Johnson $9,000 to $12,000 a year. Johnson points out that Bieganowski

testified that his estimates were conservative and that the jury was therefore entitled to award more. The jury, however, awarded an amount that if invested at six percent interest would give him an amount as much as twice Bieganowski's estimate; and still the principal would not be touched. Such an amount is clearly excessive. We are unable, however, to grant a remittitur; because the record does not reflect evidence of Johnson's life expectancy nor of the proper method of discounting, we cannot determine the basis on which the jury made its award so as to know the maximum recovery the record would allow. *See Nissho-Iwai Co. v. Occidental Crude Sales*, 729 F.2d 1530, 1548 (5th Cir.1984).[8]

### V

In sum, we leave as entered the unappealed judgment for past and future pain and suffering; we remit the award for past necessary medical and hospital care and medication to $4,676.40; we reverse the awards for past loss of earnings or earning capacity in the past and for diminished earning capacity in the future and render because no evidence was adduced to support any recovery; and we remand for a

---

**7.** The district court instructed:

In determining the amount to be allowed for the element of damage for future medical treatment and future loss of earning capacity, if any, you should consider only the present value of such amount you may allow by discounting the same or deducting therefrom annually an amount equal to the highest rate of interest at which sum could safely and securely be invested during the period for which you may allow such damages.

**8.** Michelin also asserts that it is entitled to a new trial because the trial court erroneously admitted into evidence testimony regarding a congressional report on the American tire industry.

The congressional study was first mentioned in the direct examination of Sperberg. In a lengthy narrative explaining how a tire is constructed, Sperberg stated that a minimum of eighty percent of tire failures were caused by separations. Michelin's counsel objected on the grounds that such a conclusion was speculative; the court sustained the objection and Sperberg then stated that a congressional report concluded that separation was the primary cause of tire failures. Sperberg also cited the report as sup-

port for his statement that in the event of a blowout, a vehicle might go straight or to the left or to the right. Michelin did not object at either mention of the report during Sperberg's testimony.

Michelin's counsel raised the subject of the report by asking Zambalas, on direct examination, whether Michelin had ever been the subject of a government study, referring to Sperberg's statements regarding the findings in the congressional report. When Johnson's attorney later asked Zambalas questions regarding the study, Michelin objected, but only on the grounds of materiality and relevance. The district court overruled the objection. Later, during the same cross-examination, when Zambalas was asked to read a portion of the report, Michelin again objected and the court again overruled the objection on the grounds that the question was invited.

Before Michelin raised an objection, the congressional investigation was mentioned on direct examination of both Sperberg and Zambalas. We hold that any objection was waived, and therefore the district court properly denied Michelin's motion for a new trial on this issue. We do not address, however, whether the report would be admissible if properly challenged.

new trial on damages for future necessary medical and hospital care and medication.

AFFIRMED IN PART, RENDERED IN PART, VACATED IN PART, AND REMANDED.